**William C. COMPTON, Appellant/Cross–Appellee,**

v.

**Gail F. COMPTON, Appellee/Cross–Appellant.**

**No. S–5891/5941.**

Supreme Court of Alaska.

Sept. 8, 1995.

R. Scott Taylor and Philip R. Volland, Rice, Volland and Gleason, P.C., Anchorage, for Appellant.

Joan M. Clover, Max F. Gruenberg, Jr., and Jennifer L. Holland, Gruenberg and Clover, Anchorage, for Appellee.

Before MOORE, C.J., and RABINOWITZ, MATTHEWS, COMPTON and EASTAUGH, JJ.

## OPINION

EASTAUGH, Justice.

## I. INTRODUCTION

William (Bill) Compton appeals the trial court's finding that he is not entitled to reimbursement for marital expenditures that he

claims benefited property of his former spouse, Gail Stover. Bill argues that the couple's prenuptial agreement requires reimbursement. We affirm the trial court's finding that reimbursement is not required. We also affirm the trial court's distribution of the parties' vehicle and disputed bank account and its finding that an award of attorney's fees is not appropriate in this case. We remand regarding distribution of the couple's marital residence.

## II. *FACTS AND PROCEEDINGS*

On the day they married in 1988, Gail and Bill signed a prenuptial agreement which provided that the parties would keep all premarital property, including any increase in value of the property or property acquired in exchange for premarital property, as their "sole and separate property." When their marriage began Bill and Gail each had a substantial amount of separate property, including several separate bank accounts. Gail had approximately $750,000 in premarital assets, while Bill had about $1.4 million in premarital assets.

Shortly after they married, Bill added Gail's name to one of his separate bank accounts (the 571 account). Bill placed his marital income into this account and transferred funds from his separate accounts into this account during the marriage. Gail placed some of her marital income into this account as well. Both parties wrote checks on this account throughout the marriage. During the marriage, and unknown to Gail, Bill opened a separate account (the Wedbush account) and began depositing his marital income in that account.

Bill and Gail expended a considerable amount of money during the marriage. They sold Bill's house and spent over $230,000 remodeling the Barry Street house which Gail brought into the marriage. They bought an airplane and a Suburban vehicle, and spent approximately $114,000 on Bill's two children and approximately $90,000 on travel, jewelry and clothes. In the course of the marriage, over $630,000 of Bill's income earned on premarital assets was placed into the joint 571 account. Bill and Gail separated in 1991, and Bill filed for divorce in 1992. Their marriage lasted three years and eleven months.

During the divorce proceedings, Bill alleged that $620,000 of the amount spent during the marriage was from his separate assets and that approximately $315,000–$340,000 of this amount was spent to enhance Gail's separate assets, including payments for remodeling her premarital home on Barry Street, the mortgage, and taxes on Gail's separate real estate. Bill argued that the parties' premarital agreement entitles him to reimbursement of his separate assets which he transferred to Gail by spending them on her property and debts. He testified that he cannot remember if he was ever advised to keep separate property segregated, but that the prenuptial agreement precludes any conclusion that his separate property, including his separate property which he placed into the couple's joint checking account, became marital. Bill's expert witness, an accountant, determined that the marriage had "overspent" itself by approximately $29,000.[1] Bill also estimates that his net worth decreased by $331,000 during the marriage. Bill claimed at trial that Gail had to repay him the nearly $340,000 he spent on her separate property.

At trial Gail disputed Bill's assertion that he is entitled to reimbursement of his separate funds that he spent during the marriage. Gail asserted that she and Bill were advised by their respective attorneys to keep their separate property segregated and were warned that if they did not they should consider themselves as having donated it to the marital unit. Gail argued that because Bill had chosen to "supplement[ ] the marital coffers" with his separate income by placing it into the joint 571 checking account, Bill could not argue that this money somehow remained separate property which had to be

---

1. The accountant originally testified that marital income was $843,000 and that the couple spent $920,858 during the marriage. Thus, the marriage overspent itself by approximately $77,000. After corrections made during trial, the accountant revised these numbers. According to the new assessment, the marriage overspent itself by about $29,000. The court adopted this new estimate.

reimbursed by Gail. Gail also asserted that before she married Bill she had lived a lifestyle within her economic limitations and that her personal income during the marriage would have been greater had she not reduced her work hours at Bill's suggestion. Both sides agree that Bill never gave Gail any reason to believe during the marriage that the money placed into the joint checking account remained separate and would have to be reimbursed at a later date. Gail asserted that if Bill had indicated that he was "lending" her the money for remodeling the Barry Street residence or for tax payments, jewelry, and the like, it would have affected her decisions to work part time, maintain two private airplanes, remodel her home, and spend $114,778 on Bill's two children. She testified that she believed that if she mixed her separate assets with marital assets she would be contributing them to the "marital pot."

The trial court distributed the parties' assets according to established principles under Alaska law. *See Wanberg v. Wanberg,* 664 P.2d 568, 570 (Alaska 1983) (requiring the court to undertake a three-step analysis to determine division of property); *Merrill v. Merrill,* 368 P.2d 546, 548 n. 4 (Alaska 1962) (articulating factors relevant to determining equitable division of property). The court found the Barry Street house, where Bill and Gail had resided during most of their marriage, to be marital property and divided the net marital equity in half. The court thus awarded Bill one-half of the increase in value of the house due to the remodeling, but not one-half of the actual costs of the remodeling. The court also divided equally each party's retirement plan, the depreciated value of the Suburban vehicle, and the Wedbush bank account.

The court refused to credit Bill for his expenditures on Gail's separate real estate, investments, or tax liabilities. The court found that if Bill had told Gail "or even given

significant hints" that she would need to reimburse Bill, the "extravagant spending patterns engaged in by both parties would not have occurred." The court also found it impossible to determine whether the funds that backed the payments Bill made to Gail's separate property were in fact separate funds. The court stated that implicit in its conclusion was the determination that the court was not required to enforce a prenuptial agreement where the parties' actions and expressed intent are contrary to the agreement. The court cited *In re Marriage of Fox,* 58 Wash.App. 935, 795 P.2d 1170 (1990), as support for this conclusion.

On appeal Bill argues that the superior court erred by refusing to enforce the prenuptial agreement, and thus failed to order the required reimbursement. Bill also argues that the court divided three specific items of property incorrectly: (1) the Barry Street residence; (2) the Suburban; and (3) the Wedbush account. Gail cross-appeals, asking for attorney's fees under AS 25.24.140(a)(1) and Alaska Civil Rule 82.

## III. *DISCUSSION*

Bill argues that under the terms of the prenuptial agreement, he is entitled to reimbursement for the portion of his separate funds that benefited Gail's separate property; furthermore, because there is insufficient marital income with which to reimburse him, the reimbursement must come from Gail's separate property. Gail responds that reimbursement is not required under the terms of the prenuptial agreement, nor is it permissible under principles of equity and fundamental fairness. Rather, Gail argues, Bill's contributions should be viewed as gifts to Gail and to the marital unit, as permitted under paragraph five of the prenuptial agreement. Gail thus argues that the agreement does not preclude transmutation of separate property into marital property.[2]

---

2. We review a trial court's allocation of property in a divorce proceeding under the abuse of discretion standard. *Wanberg,* 664 P.2d at 570. We will reverse the trial court's determination only if the allocation is clearly unjust. *Jones v. Jones,* 835 P.2d 1173, 1175 (Alaska 1992). Whether the trial court applied the correct legal standard in exercising its broad distributive discretion is a separate legal issue which we review de novo while considering the rule of law most persuasive in light of precedent, reason and policy. *Cox v. Cox,* 882 P.2d 909, 913 (Alaska 1994); *Guin v. Ha,* 591 P.2d 1281, 1284 n. 6 (Alaska 1979).

Although the lower court stated that implicit in its conclusion that Bill was not entitled to reimbursement was its determination that a court need not enforce a prenuptial agreement where the parties act contrary to the agreement, this determination is only dispositive if reimbursement is otherwise required under the prenuptial agreement. Thus, we must first decide whether the prenuptial agreement requires reimbursement. Because we find that the agreement does not prohibit transmutation of separate property into marital property, we conclude that reimbursement is not required.

### A. Effect of Prenuptial Agreement on the Claim that Separate Property Was Transmuted into Marital Property

■ When a party uses separate property to acquire property during a marriage, the acquired property is treated as marital property if the trial court determines that the owner of the separate property intends that the newly acquired property be marital or if circumstances indicate that the other spouse has made significant contributions with respect to the property. *Lewis v. Lewis*, 785 P.2d 550, 555 (Alaska 1990) (citing *Wanberg*, 664 P.2d at 571–72). Under paragraph one of the parties' prenuptial agreement, each party was to keep as "sole and separate property" all of the party's premarital property, "including any increase of value of such property referred to in this paragraph or any property acquired in exchange for such property." Bill argues that because of this provision, Gail had notice that any of Bill's separate property used to benefit Gail's separate property could not later be deemed marital regardless of how the parties treated the property during the marriage.[3] Bill's reading of the paragraph would prohibit a court from invading separate or premarital property, regardless of either the parties' intentions after signing the agreement or the requirements of equity. This interpretation of the agreement is not in accord with past precedent or sound policy.

■ We hold that a provision such as paragraph one should be considered persuasive evidence that the parties meant to maintain premarital property as separate. However, this evidence is not conclusive. While trial courts must consider a premarital agreement as probative evidence of the parties' intent, courts are not prohibited by the existence of a prenuptial agreement from inquiring into the parties' treatment of property during marriage and treating specific assets as marital if it finds the parties so intended. Under this analysis, unlike rescission or unenforceability due to unfairness, the agreement remains valid, but controls distribution of only those assets which the parties handled in accordance with the prenuptial agreement.[4] *Cf. Keffer v. Keffer*, 852

---

**3.** The prenuptial agreement provided:

1. *Sole and Separate Property*. The parties agree that each party will keep, as that party's sole and separate property, all of that party's premarital property (see exhibits A & B) and any property subsequently acquired by inheritance or by gift from a third party, including any increase of value of such property referred to in this paragraph or any property acquired in exchange for such property.

2. *Marital Property*. The parties intend that all assets accumulated by them during the marriage, (and other than those assets which are excluded under paragraph 1, above), shall be considered marital property, and therefore subject to division between the parties upon dissolution of the marriage.

**4.** We will not enforce a prenuptial agreement if the facts and circumstances have changed since the agreement was executed so as to make enforcement unfair and unreasonable. *Brooks v. Brooks*, 733 P.2d 1044, 1049 (Alaska 1987). If the parties' prenuptial agreement required reim-

bursement to Bill, we would be required to decide whether enforcement of the agreement would be fair and reasonable given the parties' actions after signing the agreement. However, because we hold that the prenuptial agreement does not preclude transmutation, and thus does not require reimbursement to Bill, we need not decide whether the agreement would be unenforceable if it required reimbursement.

Paragraph seven of the prenuptial agreement requires that all modifications or amendments of the agreement be in writing. This provision does not obviate our holding that the agreement does not preclude transmutation. While the agreement indicates that the parties intended that separate property remain separate, the parties' actions indicate otherwise with respect to certain assets. Thus, we do not hold that the agreement was modified or waived by the parties' actions, but rather that the agreement is not the only evidence the court should consider in determining whether the parties intend to transmute particular items of separate property into marital property.

P.2d 394, 397 (Alaska 1993) (goal in interpreting a contract is to give effect to the reasonable expectations of the parties, requiring review of language of contract, case law, and relevant extrinsic evidence).

This approach follows from our decision in *Brooks v. Brooks*, 733 P.2d 1044, 1048–51 (Alaska 1987), where we upheld the validity of prenuptial agreements made in contemplation of divorce. The agreement in that case provided in part that

> it is the desire of the parties that said separate property shall retain its status free and clear of any claims by either party or their heirs against the property of the other ... and [property] shall be subject to his or her disposition as his or her separate property in the same manner as if said proposed marriage had never been celebrated.

*Id.* at 1046–47. After determining that the Brooks' agreement was valid and enforceable, we addressed the question of whether Ms. Brooks was entitled to one-half of the postmarital appreciation of one of Mr. Brooks' premarital assets. Rather than relying on the provisions of the prenuptial agreement as conclusive, we determined whether invasion was necessary considering all the circumstances of the case. We held that invasion of the postmarital appreciation of the premarital property was not appropriate because the parties did not demonstrate their intent to treat the property as joint property by taking an active interest in control or management of the property; nor did Ms. Brooks make a contribution to the marital community which benefited Mr. Brooks' premarital property. We found that the parties exhibited the exact opposite intention:

> The record shows that [Vern Brooks] purchased the apartment complex over two years before the Brooks' marriage and that throughout the marriage, title to the property remained solely in his name. Vern also made all the mortgage payments and the Brooks never resided at the complex. The evidence further shows that the Brooks tried, as much as possible, to keep their respective assets and funds separate. Moreover, the parties' prenuptial agreement unambiguously denotes an intention to hold their prenuptial assets separately, "as if said ... marriage had never been celebrated."

*Id.* at 1053–54. Thus, we considered the prenuptial agreement to be extremely probative, but not conclusive, of the parties' intent to keep their premarital property separate. *See also Chotiner v. Chotiner*, 829 P.2d 829, 833 (Alaska 1992) (citing *Brooks* for the proposition that written agreements may demonstrate an owner's intent to convert separate property to marital property).

Other jurisdictions have also adopted a view of prenuptial agreements which recognizes that such agreements should be construed in accordance with the parties' intentions throughout the marriage rather than adhered to formalistically. *See, e.g., Estate of Gillilan v. Estate of Gillilan*, 406 N.E.2d 981, 988 (Ind.App.1980) (holding that prenuptial contracts are given liberal rather than strict construction in order to effectuate the intent of the parties); *In re Marriage of Pillard*, 448 N.W.2d 714, 715 (Iowa App. 1989) (same, citing *In re Parish's Estate*, 236 Iowa 822, 20 N.W.2d 32, 36 (1945)). *See also Pillard*, 448 N.W.2d at 717 ("[T]he end result in any dissolution action is not an interpretation of a prenuptial agreement but an assessment of all factors, including the agreement, to see if there is in fact an equitable result.") (Sackett, J., concurring).

In this case, the trial court found that the commingling of the parties' separate and marital assets was "extensive, and only traceable with heroic and tenacious effort on the part of Bill Compton and [his accountant]." The court elaborated, "Bill simply wrote out the checks from the 571 account, paid on his separate property, paid [on] her separate property and paid on marital bills without regard to whose pot the money came from and whose asset the payment improved." Bill testified that he never indicated to Gail that he considered the money spent on her separate tax liabilities, the Barry Street remodeling, or the Suburban, a loan. Bill's testimony at trial clearly indicates that he did not think of the money placed in the 571 account as separate, even though it came

from his separate funds.[5] There was also evidence that the couple originally planned to jointly borrow the money for the Barry Street remodeling but decided to use funds from one of Bill's separate accounts after being advised by Bill's financial advisor that it would be less expensive and easier than obtaining a loan.

■ In this case, unlike *Brooks,* the prenuptial agreement is the *only* evidence that the parties intended to keep the assets in question separate. Bill's testimony and handling of the parties' finances during the marriage support the court's finding that when Bill mixed his separate property with marital money and used his income from separate assets to support marital and Gail's separate property, his intention was to make a gift to the marital unit, despite the existence of paragraph one of the prenuptial agreement.

Bill argues that interpreting the prenuptial agreement to allow for transmutation renders the premarital agreement "meaningless." We disagree. As the trial court noted, the parties did not dispute that most of their significant premarital property was protected by the prenuptial agreement. Thus, the agreement provided meaningful protection to most of the parties' property. To the extent paragraph one of the agreement is ineffective, the parties themselves rendered it so by not segregating their separate assets.

B. *Distribution of the Barry Street Residence, the Suburban, and the Wedbush Account*

In addition to disputing the court's overall theory of distribution, Bill argues on appeal that the court erred with respect to three specific assets: the Barry Street residence, the Suburban, and the Wedbush account. We affirm the court's distribution of the Suburban and the Wedbush account and reverse the trial court's distribution of the Barry Street residence.

1. *The Barry Street residence*

Both parties agree that the Barry Street home was transmuted into joint property during the marriage. Bill argues that, in accordance with his general reimbursement theory under the prenuptial agreement, he should be reimbursed the entire amount he contributed to remodeling the residence, approximately $190,000. Alternatively, Bill argues that the house should be treated as a joint economic enterprise, and, since the parties contributed roughly equal amounts to the enterprise, the value of the house at the time of divorce should be divided between the parties.

During the marriage, the equity in the home increased from $48,000 to $123,000. Thus, the net equity accruing during the marriage was $75,000. The court, citing to *Wanberg,* 664 P.2d 568, determined that the home was marital property and that the $75,000 equity accruing during marriage should be divided equally between the parties.

■ Bill has not established what amount of money he contributed from his separate funds, since these funds came from the parties' joint 571 account. Furthermore, it is undisputed that the parties were prepared to take out a loan together to remodel the home and that it was on the advice of their financial advisor that they decided to use liquid assets. It was not an abuse of discretion for the superior court to find that the parties intended to treat the money used to remodel the house as "their" money. Moreover, Bill's reimbursement analysis, as stated in section A, *supra,* is rejected under the prenuptial agreement and under Alaska law.[6] Bill's argument that the value of the property rather than merely the equity

5. Although Bill testified that he believed the premarital agreement meant that if he put money from his separate income into the joint account the character of the money would remain unchanged, he also stated that he came to this conclusion "to some degree" after he met with his attorney during divorce proceedings. More importantly, the great majority of Bill's testimony at trial was inconsistent with this assertion.

6. Bill argues that the prenuptial agreement entitles him to reimbursement. Alaska case law also provides for reimbursement in a marriage of short duration where there has been no significant commingling. *Rose v. Rose,* 755 P.2d 1121 (Alaska 1988). The trial court rejected an application of *Rose* to this case. Bill does not appeal that decision.

should be divided equally also ignores the fact that Gail owes a mortgage debt of approximately $142,000 on the property.[7]

However, Bill is correct in asserting that the court erred in awarding him only the amount of equity that accrued during marriage. In *Wanberg* we held that it was an abuse of discretion for the trial court to allocate only the equity actively accrued during marriage where the parties had demonstrated an intent to treat premarital property as joint property. 664 P.2d at 572. The court reasoned that the property had, for the purposes of division, become marital through the combined efforts of the parties. *Id.* Thus, the court had to allocate the entire equity in the property. *Id.* at n. 16.

We have affirmed on numerous occasions the principle that the entire equity in a piece of joint property should be allocated. *See, e.g., Chotiner,* 829 P.2d at 832 n. 4 (citing *Burgess v. Burgess,* 710 P.2d 417, 420 n. 3 (Alaska 1985)) (while it may invade separate property, the court must take into account marital property in its property division); *McDaniel v. McDaniel,* 829 P.2d 303, 306 (Alaska 1992) (recognizing that *Wanberg* requires the entire equitable value of property to be divided where the parties have demonstrated an intent to treat property as jointly held); *Moffitt v. Moffitt,* 749 P.2d 343, 347 (Alaska 1988) (upholding decision to divide entire property as marital asset where parties treated property as a joint holding).[8] In this case, both parties admit that the property is joint property. Consequently, the entire value of the equity, $123,000, is subject to allocation. Gail concedes in her brief that the entire equitable value of the Barry Street residence was before the court, but argues that the court may have had equitable reasons for granting Bill only one-half of the marital equity. However, in the court's own words, it found "no substantial basis to do other than divide this net marital equity in half." We hold that Bill should be awarded $61,500, one-half of the equity in the Barry Street residence.

## 2. The Suburban vehicle

■■■■■ The court did not abuse its discretion in determining that the Suburban was marital property. Although the vehicle was purchased with funds from Bill's separate account, it was titled in Gail's name alone, purchased to replace Gail's car, and used as a family car. Both parties testified that the vehicle was paid for out of the separate account because there was insufficient money in the joint 571 account at the time of the purchase. The parties exhibited an intent to treat the Suburban as marital property. The court was thus permitted to allocate it equitably under the *Wanberg* line of cases. We affirm the court's decision to divide the present value of the Suburban equally between Bill and Gail.[9]

## 3. The Wedbush account

■■■■ We affirm the trial court's determination that the Wedbush account was subject to division and hold that Bill waived any

---

7. Bill's argument that such a division is allowed under the prenuptial agreement because "Gail clearly acknowledged that the entire mortgage liability remained her separate debt," is without merit. First, Bill cannot simultaneously argue that the house is joint through transmutation, allowing him the benefit of one-half of all the equity, yet separate under the prenuptial agreement. Second, Gail does not dispute that she is liable for the debt and is not asking that Bill pay any part of future mortgage payments.

8. In *Burgess v. Burgess,* 710 P.2d 417 (Alaska 1985), we concluded that the factors which caused the *Wanberg* court to determine that the disputed property was marital property—use of the property as joint personal residence and active interest taken by both parties in the management and maintenance of the property—were also present in *Burgess.* However, after concluding that the property was not separate, we ordered that the value of the equity *accumulated during the marriage* was a marital asset and should have been allocated. 710 P.2d at 420–21. This deviation from *Wanberg* was not explained, nor was any other case cited. The cases cited above indicate that *Wanberg* is correctly read as requiring allocation of the entire equity of joint property.

9. Bill's argument that the court should have valued the Suburban at its purchase price of $24,000 is without merit. Property should be valued at the time of trial to avoid inequitable results. *Moffitt v. Moffitt,* 813 P.2d 674, 678 (Alaska 1991). *See also Bell v. Bell,* 794 P.2d 97, 102 (Alaska 1990) (expressing doubt about propriety of reimbursing where value of assets has drastically changed).

argument that the account was incorrectly valued. Bill argues that even though the Wedbush account included deposits from his marital salary, it should not be divided because the marriage overspent itself. This argument, which is founded on Bill's reimbursement theory, is likewise rejected.

Bill further contends that the court erred in valuing the portion of the account that was deposited from marital income (1) by failing to segregate separate income, including a $25,000 premarital balance in the 571 account which had been rolled into the Wedbush account; and (2) by valuing the account as of August 30, 1991, rather than as of a date closer to trial.

■ Bill never advised the court of any dispute regarding the valuation of the Wedbush account. The parties conferred with the court after the court issued its proposed decision, and the court stated that the only dispute regarding the Wedbush account was whether it was subject to division. Bill's attorney never indicated during the conference, nor during trial, that the court had valued the Wedbush account incorrectly. Thus, Bill waived any argument that the trial court valued the Wedbush account incorrectly. *See Adoption of F.H.,* 851 P.2d 1361, 1365 n. 4 (Alaska 1993) ("A party generally may not present new issues or advance new theories to secure a reversal of a lower court decision.") (quoting *Zeman v. Lufthansa German Airlines,* 699 P.2d 1274, 1280 (Alaska 1985)).

### C. *Attorney's Fees*

The trial court ordered the parties to bear their own costs and attorney's fees. On cross-appeal Gail argues that the trial court erred in failing to grant Gail attorney's fees in light of amendments to AS 25.24.140(a)(1) and Civil Rule 82(b)(3).

Except in circumstances not present here, Rule 82 does not apply to divorce cases. *Cooper v. State,* 638 P.2d 174, 180 (Alaska 1981); *Burrell v. Burrell,* 537 P.2d 1, 6 (Alaska 1975). Further, the 1990 amendment to AS 25.24.140(a)(1) did not change the analysis relevant to Gail's attorney's fees claim.

We consequently affirm the trial court's decision regarding attorney's fees.

### IV. *CONCLUSION*

We AFFIRM the trial court's conclusions that Bill transmuted some of his separate property into marital property and gave other property to Gail, and is thus not entitled to reimbursement. We also AFFIRM the trial court's distribution of the Suburban and the Wedbush account and its determination that attorney's fees should not be awarded to either party. We REVERSE the trial court's finding that Bill is entitled to one-half of the marital equity of the Barry Street residence and instead hold that Bill is entitled to one-half of the entire equity of the residence since both sides agree that the home is joint property.