Jack **FORSHEE**, Appellant,

v.

Shan **FORSHEE**, Appellee.

No. S–11751.

Supreme Court of Alaska.

Sept. 8, 2006.

Rehearing Denied Nov. 16, 2006.

William T. Ford, Anchorage, for Appellant.

Joan M. Clover, Law Office of Joan M. Clover, Anchorage, for Appellee.

Before: BRYNER, Chief Justice, MATTHEWS, EASTAUGH, FABE, and CARPENETI, Justices.

*OPINION*

FABE, Justice.

## I. INTRODUCTION

This property division appeal arises from the divorce of Jack and Shan Forshee. Jack argues that the superior court erred in its identification and valuation of several marital assets and liabilities, including the marital residence, a lot used by Jack to store business supplies, an investment property in Washington State, retirement benefits originally held by Shan, and a list of several business debts. Jack alleges that he was unable to present adequate evidence because he lacked legal representation at trial, and he claims that the superior court erred in denying his motion for a partial new trial. Because the superior court's identification and valuation of each item of property was supported by the evidence in the record, we affirm its judgment.

## II. FACTS AND PROCEEDINGS

### A. Marriage and Divorce

Shan and Jack Forshee were married on July 5, 1986, and they had three children during their marriage.[1] From 1993 until after the divorce trial, Shan was employed by the Municipality of Anchorage as a real estate appraiser. Her federal taxable gross salary was approximately $55,000. Jack, who ran his own construction business[2] until he was diagnosed with leukemia in 2000, was unemployed at the time of the divorce. Although Jack's leukemia was in remission at the time of trial, the court found that it was "unlikely that [he would] be able to restart any of his business ventures quickly." Shan and Jack separated on March 4, 2004.

### B. Jack's Self–Representation at the Divorce Trial

Although the form answer filed by Jack contained a space to request interim attorney's fees, and noted that the court could "give these [fees] to [the litigant] before the end of the case,"[3] Jack did not move for interim attorney's fees. The court ordered Jack to attend a Family Law Education Class to "learn how to handle [his] own case and what the Judge [would] expect[ ][him] to do," and the Family Law Self–Help Center later certified that Jack had completed the class. At trial, Jack proceeded pro se. At the conclusion of Shan's testimony, the court gave Jack the option of cross-examining Shan or taking the stand himself, and suggested that the latter would be more effective:

> All right, Mr. Forshee, let me explain how this works and I'll ... give you an option. You're entitled to ask questions. My experience with people who ... don't want

lawyers, don't really know how to do cross-examination, is that they often have a lot of points that they want to make, and try to make these points in the questioning of Ms. Forshee, for example. And that, in all likelihood, the more efficient way for you to get across what you want me to hear, is to actually just simply take the stand yourself and tell me what you want [me] to hear, rather than trying to get her to admit whatever point you're trying to make....

Jack chose to testify, and he engaged in a dialogue with the trial judge regarding each item of property.

### C. Marital Property

Several items of marital property, including real property, personal property, and financial assets, were at issue during the divorce trial. Before trial, the parties disagreed primarily about the values of assets rather than who should receive each asset. But the court departed from the proposed distribution "in order to avoid the need for a large equalization payment and to give each party a similar mix of assets and liabilities."

#### 1. Marital residence

Both parties agreed that the Anchorage house that had been their marital residence should be awarded to Jack, and both agreed that the mortgage balance at the time of trial was $55,562. Jack claimed that the value of the house was $131,200, citing as evidence a municipal tax assessment and two contractors' estimates of the cost of completing an unfinished addition and other repairs and upgrades.[4] Shan claimed that the home was

---

1. Custody was not disputed below and is not at issue in this appeal.

2. From 2000 until the dissolution of the business in 2003, Shan had power of attorney over its finances. Jack claims that the cause of the dissolution of the business was Shan's use of business accounts to pay personal and household expenses instead of paying debts owed by the business. Shan disputes this claim, and maintains that the construction business failed because Jack's illness rendered him unable to work.

3. The form directed users to the website of the Family Law Self–Help Center, which provides

pro se family litigants forms and information on court procedure, including how to file motions. *See* Alaska Court System, Family Law Self–Help Center, *Motion Practice—Requesting an Order from the Court,* htt p://www.state.ak.us/courts/motions.htm.

4. The estimates for completing the addition were $86,000 and $107,000; the estimates for the "laundry list of needed repairs and upgrades" were $95,000 and $113,000.

worth $285,000, citing the estimate of an appraiser who drove by the home. She also estimated a significantly lower cost for completing the addition.[5]

The court determined that both estimates were questionable, as Jack had provided "little explanation about the alleged need for so much work," and Shan's appraiser had not inspected the interior of the house. But because the tax assessment was "simply ... too low given the size of the house," the court used Shan's appraisal as a starting point and deducted $35,000 for the cost of completing the addition, and $25,000 for needed repairs.[6] The house was therefore assigned a gross value of $225,000, with net equity amounting to $169,432.

Jack retained an attorney immediately after the court issued its judgment, and filed a motion for a partial new trial.[7] In this motion, Jack pointed out that the court's valuation of the house was different from either party's estimate, and argued that, as a pro se litigant, he was unable to present adequate evidence to support his claims.[8] He asserted that the court "should have directed the parties to obtain a current appraisal by a mutually agreed qualified appraiser." Although the court acknowledged that the evidence presented was less than optimal, it declined to grant a new trial on this issue, and noted that Jack had "never once stated that his medical condition or emotional state precluded him from participating in the trial or from presenting the evidence that he wanted."

### 2. Commercial lot

Jack and Shan also owned a commercial lot where Jack stored his construction equipment during his illness. The court noted that Jack wanted to receive the lot, but determined that reaching a "realistic division that does not require an enormous cash payment from one to the other party" required that the lot be awarded to Shan. Jack contended that the 48,000 square foot lot was worth $168,000, using his own estimate of $3.50 per square foot. Shan claimed that it was worth $262,000, based on a broker's estimate of between $5 and $6 per square foot. The court considered these values, as well as neighborhood conditions such as new construction, and assigned the lot a gross value of $240,000. It awarded the lot to Shan on the condition that she "allow Jack to store his vehicles and equipment on the lot rent free until 1 July 2005[,] unless she has a buyer or lessor ... before then," in which case Shan was to provide reasonable notice to Jack.

In November 2004 Shan found a buyer for the lot. In order to prevent her from selling it before he could move his business equipment, Jack filed a notice of lis pendens.[9] Less than a week later, Shan filed an expedited motion for clerk's deed to transfer Jack's interest to her, and Jack, now represented by counsel, filed an opposition. The court granted Shan's motion. Shan then moved for an expedited order lifting the lis pendens; the court granted her motion on December 1 "without input from [Jack] based on [Jack's] earlier responses to the related motion concerning the clerk's deed." Shan sold the property the same week, and Jack moved for reconsideration, arguing that he was not given notice of the order lifting the lis pendens until December 7, and seek-

---

5. The appraiser's estimate of the cost of completing the addition was $15,000. She gave no estimate of the cost of interior repairs.

6. It noted that these figures were "necessarily ... somewhat arbitrary," but that Jack's cost estimates were likely inflated, and it was not clear that all of the repairs sought by Jack were necessary.

7. Shan also filed a motion for partial reconsideration, but she does not appeal the court's disposition of that motion. Jack, however, contests the denial of his motion for a partial new trial with regard to several items of property.

8. He also claimed that Shan, as a municipal appraiser, should have obtained a higher-quality appraisal.

9. *See Waiste v. State*, 10 P.3d 1141, 1146 n. 17 (Alaska 2000) (citing *Black's Law Dictionary* 1081 (Rev. 4th ed.1968), in which "notice of lis pendens" is defined as "notice filed for the purpose of warning all persons that the title to certain property is in litigation, and that, if they purchase the defendant's claim to the same, they are in danger of being bound by an adverse judgment").

ing to buy Shan's interest in the lot. The superior court denied Jack's motion.

In addition to the lis pendens matter, Jack argued in his motion for a partial new trial that the court had erred in its valuation of the commercial lot, making similar arguments to those that he made regarding the marital home. The superior court declined to grant a new trial for the reasons that Jack had been provided with ample opportunity to present evidence, Jack had not voiced concern at trial about his ability to present evidence, and the evidence presented at trial, while "less than optimal," was adequate.

### 3. Washington State investment property

In 1993 Jack purchased an investment property in Spokane, Washington by trading a parcel of real estate worth $64,000 [10] and an additional $18,000 of marital cash. Jack and his brother each owned a fifty percent interest in this Washington State parcel, which contained a restaurant, bar, and cabins and operated under the name of Forshee's Last Resort. In June 2000 Jack conveyed his interest in the Washington property to his brother by quitclaim deed, receiving no direct compensation in exchange. In response to questions from the court, Jack maintained that the total value of the property at the time that he conveyed his half to his brother was $350,000 and claimed that he conveyed the interest because his accountant recommended it, because Shan was threatening to divorce him if he kept it, and because "the investment never got the time and money it required to make a good go of it." At the time of trial, however, Jack was still listed by the State of Washington as a corporate officer of Forshee's Last Resort. Shan claimed that the transfer was made because she and Jack "weren't getting along at the time" and because it would be easier to refinance under the name of Jack's brother.

The court found that Jack's claims regarding the reasons he transferred his interest

were not credible, and determined that the real reason for the transfer was to remove the property from the marital estate, "with the expectation that [Jack] would retain a de facto interest in the property." Discounting the $175,000 value of Jack's share because "[a] third party would be reluctant to purchase land that is intertwined with a closely held family business," the court found that the marital interest in the property had only appreciated to $100,000, and credited Jack with receipt of that amount.

Jack's motion for a partial new trial claimed both that the superior court had erred in determining that Jack retained a continuing interest in the property and that the court had erred in its valuation of his interest. But the motion, which was prepared by the attorney hired by Jack after trial, did not deny that the Washington State property was marital property when Jack did have an interest in it. As it did for the marital residence and commercial lot, the court acknowledged that the quality of evidence was less than optimal, but it "d[id] not find that the quality of the evidence was so poor that a new trial [wa]s needed."

### 4. Shan's PERS account

At the time of trial, Shan had three retirement accounts, including a vested PERS account. At trial, the parties expressed agreement about the "value" of the PERS account, but did not distinguish "paid-in value" [11] from present value:

> Court: Is there any dispute about the value of the PERS[,] 401(k)[,] and deferred compensation?
>
> [Jack]: No, Your Honor, I don't . . . . .
>
> Court: Yeah, so . . . . .
>
> Mr. Lack: Then I would just move to admit Exhibit 30, the value for the PERS retirement is $43,000, the 401(k) is $44,000, and the deferred comp is $8,700.

The court admitted as an exhibit a benefit statement dated June 30, 2003, in which

---

**10.** Although Jack purchased the $64,000 traded parcel before the marriage, Shan testified that substantial mortgage payments on the real estate were made from marital assets for between seven and eight years.

**11.** We use this term because it is used by the parties to describe the account balance on Shan's annual benefit statement.

Shan's PERS balance was listed as $43,676.79. The trial court determined that the value of the PERS account was $43,000, and awarded the PERS account to Shan.

In his motion for a partial new trial, Jack asserted that the court had erred by using the paid-in value of the PERS account instead of the present value, and argued that the present value was "likely to be at least twice [the paid-in value]." The court denied a new trial on this issue, stating that it

> cannot determine if the value used for the PERS was reduced [to present value] or whether that figure represented the balance at the time of the trial. The court suspects it was the latter. But if the account is reduced to present value, only Jack is harmed. The values of the marital estate and Shan's portion are reduced[,] while the value of his portion remains the same while his relative percentage is increased. The [c]ourt sees no reason to have a new trial to make this correction.

#### 5. Additional debts

In his Property and Debt Worksheet, Jack listed debts totaling $52,385 as of March 5, 2004. He designated a modified version of this list as an exhibit, but appears not to have introduced it into evidence at trial.[12] When the court discussed the allocation of the couple's debt, it engaged in the following exchange with Jack:

> Court: The debts, you see how she's allocated the debts on her property list?
>
> Jack: Yes, sir.
>
> Court: That—you know, you get the ones that she says you get and she keeps the ones she says she keeps, is that acceptable?
>
> Jack: Yes sir, I believe so.
>
> Court: Okay.
>
> Jack: There were a few things on my list. . . . .

Court: All right, hang on, we'll get to your list.

Jack: Okay.

Shortly thereafter, the court asked if there was "anything else you want to tell me about any other topic involving debts, liabilities, value of things or the distribution of things." It then inquired, "[d]o you want to think about that for a while," to which Jack responded, "I'd like to, yes sir." Jack then raised an issue relating to his son's testimony, and the court took a recess. The court then asked him, "is there anything else you want to tell me?" Jack responded that there was not. At the end of the trial, the court asked both spouses if either of them had "anything else you want to present," to which both responded in the negative.

In his motion for a partial new trial, Jack claimed that he had "attempted to present evidence of significant business obligations totaling $67,000," but that he was unable to present this evidence "[b]ecause of his inability to effectively represent himself at trial." The court denied the motion with regard to the debts, stating that Jack "ha[d] provided no explanation for his failure to mention those debts at trial," and pointing out that Jack "was not shy about raising topics" and had shown himself "capable of presenting cogent arguments on his behalf." This appeal followed.

### III. DISCUSSION

#### A. Standard of Review

Property division entails "determining what property is available for distribution, assessing its value, and allocating it equitably."[13] We review the trial court's characterization of property as marital or separate for abuse of discretion.[14] Whether the trial court applied the correct legal standard is a question of law that this court reviews de novo.[15] The trial court's factual findings regarding the value of property are

---

12. The document that Jack cites lists both business and credit card debts, some of which were addressed by the court. As Shan correctly notes, the $46,245.92 figure appears nowhere on the face of the document, although it is less than the sum of all debts listed in the document.

13. *Fortson v. Fortson,* 131 P.3d 451, 456 (Alaska 2006).

14. *Id.*

15. *Id.*

reviewed for clear error, which exists "if, upon review of the entire record, we are left with a firm and definite conviction that a mistake has been made."[16] We review the ultimate distribution of assets for abuse of discretion, and will reverse it "only if the distribution is clearly unjust."[17] As Jack correctly notes, this court reviews a trial court's denial of a motion for a new trial for an abuse of discretion.[18]

## B. The Court's Failure To Solicit Additional Evidence from Jack

Underlying all of Jack's arguments is his contention that he did not receive a fair trial because he was an unsophisticated pro se litigant who was recovering from a serious illness. He alleges that he did not know that his case would have been better served by presenting additional evidence regarding the value of each item of property and that the court erred by failing to solicit additional evidence from him.

### 1. Jack's status as a pro se litigant

■ Although "the pleadings of pro se litigants should be held to less stringent standards than those of lawyers,"[19] and trial judges should take limited steps to mitigate the difficulty of representing oneself,[20] a trial judge may not compromise his or her impartiality by "sav[ing] a litigant from his choice of lawyer, including when a litigant chooses himself as legal representative."[21]

■ Given that the total marital estate amounted to over $700,000, and that the form answer specifically informed pro se litigants that they could move for attorney's fees "before the end of the case," Jack presents no reason why he could not hire an attorney before trial. Jack concedes that he "consulted an attorney immediately after receiving the court's decision." Furthermore, as the superior court noted in its rejection of Jack's motion for a partial new trial, Jack "never once stated that his medical condition or emotional state precluded him from participating in the trial or from presenting the evidence that he wanted." Thus, Jack appears to have knowingly and voluntarily chosen to proceed without counsel, and has not established that he was unable to represent himself.

### 2. Additional evidence regarding value

■ Jack cites this court's statement in *Root v. Root* that "where a party identifies a significant marital asset but presents no evidence as to its value, the best practice is for the trial court to direct the parties ... to fill the evidentiary void."[22] But the same case noted, and subsequent cases reaffirmed, that "it is the duty of the parties, not the court, to ensure that all necessary evidence is before the court in divorce proceedings."[23] Except in the situation where no evidence is presented,[24] "a party who fails to present sufficient

16. *Id.*

17. *Id.*

18. *Babinec v. Yabuki,* 799 P.2d 1325, 1327 (Alaska 1990).

19. *Breck v. Ulmer,* 745 P.2d 66, 75 (Alaska 1987).

20. *See id.* (holding that a "trial judge should inform a pro se litigant of the proper procedure for the action he or she is obviously trying to accomplish"); *but see Collins v. Arctic Builders,* 957 P.2d 980, 982 (Alaska 1998) (noting that this court has distinguished *Breck* by "refus[ing] to ... 'require judges to warn pro se litigants on aspects of procedure when the pro se litigant has failed to file at least a defective pleading'") (quoting *Bauman v. State, Div. of Family & Youth Servs.,* 768 P.2d 1097, 1099 (Alaska 1989)).

21. *Bauman,* 768 P.2d at 1099.

22. 851 P.2d 67, 69 (Alaska 1993).

23. *See, e.g., Brotherton v. Brotherton,* 941 P.2d 1241, 1245 (Alaska 1997) (quoting *Root,* 851 P.2d at 69).

24. In *Root,* the court found that the trial court's error in valuing one party's nonvested retirement benefits was "aggravated by the fact that [the party] failed to present evidence indicating the present value of these benefits." 851 P.2d at 69. But, unlike the assets at issue here, the value of the benefits in *Root* was not established at all during the trial. *Id.* at 68.

evidence may not later challenge the adequacy of the evidence on appeal." [25]

■ In the present case, evidence was presented as to the value of every asset at issue except for the Washington State investment property, in which Jack claimed he had no continuing interest,[26] and the business debts, which are addressed below. Both parties presented appraisals of the house, and Jack offered the opinions of two contractors about likely improvement and repair costs. Jack offered his own opinion of the value of the commercial lot, and Shan offered a broker's estimate. In addition, the court's opinion gives a detailed description of the property's geographic location,[27] and discusses conditions in the surrounding neighborhood that could affect the property's value, such as commercial and high-density residential construction.[28] Documents detailing Shan's retirement benefits were entered into the record with Jack's assent. Although the evidence was "less than optimal," the court was not wholly lacking in evidence about any of the assets at issue except for Jack's business debts. And Jack was not denied the opportunity to present additional evidence. For these reasons, we hold that the superior court did not err by failing to solicit additional evidence from Jack.

## C. Marital Residence

■ Jack also asserts that the superior court erred by making a "compromise valua-

tion" of the marital residence. A factual finding "unsupported by anything in the record," including a compromise valuation, is clearly erroneous.[29]

■ Here, however, the trial court did not simply adopt a compromise value without weighing the evidence. Although it noted that the evidence was less than optimal, and that a valuation would "necessarily be[ ] somewhat arbitrary," the court does appear to have considered the evidence, given certain pieces of evidence more weight than others, and explained its reasons for doing so. For example, the court found problems with both Jack's tax assessment and Shan's appraisal, but chose to use the appraisal as a starting point because the size of the house suggested that the tax assessment undervalued it. Rather than selecting a value midway between the appraisal and the assessment, and adopting it without explanation, the court reduced the assessment value to account for the cost of interior repairs, as the appraiser had not examined the interior of the home. The court then factored in reduced repair costs, on the grounds that the estimates submitted by Jack were likely inflated. Although this was an inexact method of calculating the value of the house, and could have been avoided if both parties had submitted complete appraisals and repair estimates,[30] the trial court did not simply

25. *Brotherton*, 941 P.2d at 1245 (quoting *Root*, 851 P.2d at 69).

26. Although no evidence was presented regarding the current value of the Washington State property, there was evidence of the amount of the initial investment and of circumstances, such as its connection with a family-owned business, that would likely affect the value of the land. In addition, Jack testified that, at the time of the transfer to his brother, he believed that his interest was worth $175,000. Shan testified that the total value of the property was "700 and some odd thousand the last time [she] checked."

27. The court describes the property as "roughly one-half mile to the southwest from the Tesoro station on Abbott Road across from the new GCI office and Chili's restaurant."

28. It is unclear whether the court was discussing evidence about the state of the neighborhood introduced by the parties, or simply taking judicial notice, but its discussion shows that there

was not an "evidentiary void," *Root*, 851 P.2d at 69, as to the value of the commercial lot.

29. *Moffitt v. Moffitt*, 749 P.2d 343, 347–48 (Alaska 1988) (holding that the trial court's findings were not supported by the record in a property division case where one party testified that an asset was worth $300,000, the other testified that it was worth $10,000, and the trial court "apparently chose a compromise figure somewhere between the two").

30. Jack's request for this court to remand with instructions to select a mutually agreeable appraiser is not, as Shan claims, "impossibly vague and absolutely unworkable," but it is misplaced. Jack chose to rely on a tax assessment and the contractors' estimates, rather than presenting an appraisal. The superior court's failure to be fully persuaded by this evidence, and its decision to accord some weight to the evidence presented by Shan, does not justify a remand. *Brotherton*, 941 P.2d at 1245.

"ch[o]ose a compromise figure somewhere between" [31] $131,200 and $285,000. Because the superior court's valuation of the marital residence is supported by a detailed consideration of the evidence, we hold that it is not clearly erroneous.

## D. Commercial Lot

Jack raises a similar argument with regard to the commercial lot and also states that he "believes this was not a sale to a bona fide purchaser for value." [32] As is true for the marital residence, evidence was presented by the parties, and the court appears to have weighed this evidence, rather than merely arriving at a compromise value. The court chose to give more weight to the broker's appraisal for the plausible reason that the broker's "experience of over 11 years in the field gives his opinion more credibility than Jack's." As noted above, the court also considered the lot's location and aspects of the neighborhood that could affect property values. Thus, for the same reasons that apply to the marital residence, we hold that the superior court's judgment regarding the value of the commercial lot is not clearly erroneous.

## E. Washington State Investment Property

### 1. Identification as marital property

Jack's next argument is that the superior court erred in identifying the Washington State lot as marital property. This argument is twofold: first, Jack maintains that the court erred in referring to the parcel of real estate he initially traded for $64,000 of the $82,000 investment as marital property; and second, he asserts that the court erred in imputing to him a continuing interest in the property.

### a. Whether Jack challenged the marital nature of the Washington State property below

█ Although Jack stated in his dialogue with the court that part of the $82,000 investment in the Washington State property was "a $64,000 1031 exchange [33] from a piece of property I owned and bought in 1975," [34] he did not argue at trial, or in his motion for a partial new trial, that his interest in the Washington State property prior to its transfer to his brother was not marital property. Our "requirement that an issue be preserved by being presented in the superior court" applies even to pro se litigants. [35] And as Shan correctly notes, the motion for partial new trial—which was filed after Jack had retained a lawyer—also did not challenge the court's passing reference to the traded parcel of real estate as marital property or its determination that the Washington State property was marital. Because Jack failed to claim below that the Washington State property was not marital property, we will not consider his claim for the first time here. Moreover, in view of the considerable investment of marital assets in the Washington State property—$18,000 of marital funds and a parcel in which seven to eight years of marital mortgage payments had been invested—the trial court's failure to address the question of transmutation of the traded lot does not present plain error. [36]

31. *Moffitt,* 749 P.2d at 348.

32. It is unclear if this statement is intended as an appeal of the superior court's decision to lift the lis pendens. But Jack—who is now represented by counsel—does not point to any evidence in support of this claim, and none appears in the record.

33. *See* Internal Revenue Service, Like–Kind Exchanges, http://www.irs.gov/businesses/small/industries/article/0,, id=98491,00.html ("Generally, if you exchange business or investment property solely for business or investment property of a like-kind, no gain or loss is recognized under Internal Revenue Code Section 1031.").

34. Shan also testified that the property belonged to Jack before their marriage, but she claimed that mortgage payments had been made from marital funds.

35. *Pieper v. Musarra*, 956 P.2d 444, 446 (Alaska 1998) ("Notwithstanding the leeway given to pro se litigants, the requirement that an issue be preserved by being presented in the superior court arises out of notions of judicial finality and efficiency as well as fairness to the opposing party.").

36. *Cf. Hosier v. State*, 1 P.3d 107, 112 n. 11 (Alaska App.2000) (noting that "[t]o qualify as 'plain error,' an error must be so prejudicial that

### b. Jack's continuing interest in the property

■ Ample evidence supports the court's determination that "Jack executed the quitclaim deed to protect his share in the real estate from the threat of division had they divorced in 2000." As the court correctly observed, "it makes no sense to give away assets that cost $82,000 and likely had appreciated." Even if Jack simply sought "to get away from what had become a bad investment," or to appease a spouse who wanted to discontinue the investment, he could have continued to list the property for sale and simply lowered his asking price until he found a buyer.[37] Jack's decision to give away his interest appears to have been either a willful waste of marital assets or, as the superior court found, a sham transaction designed to conceal a continuing interest.

■ Either possibility supports imputing to Jack the portion of his interest that was marital property. A spouse who engages in "economic misconduct which has unreasonably depleted marital assets" can be credited with the assets that he or she dissipated.[38]

Jack argues that the superior court made no finding of fraudulent intent on his part but the intent to engage in economic misconduct—either fraud or massive waste—is obvious from the record.[39] For this reason, we hold that the superior court did not err in imputing to Jack the portion of his interest in the Washington State investment property that was marital property.

### 2. Value of Jack's interest

Jack also argues that the superior court erred in determining the value of his interest in the Washington State property. But the court provided a plausible explanation of its estimate, stating that, while the property had likely appreciated, its value would be limited by its entanglement with a family-run business. It valued Jack's interest at $100,000, an amount significantly lower than either Jack's estimate of $175,000, or Shan's estimate of over $350,000.[40] Thus, assuming that Jack would attempt on remand to prove that the value of his interest was less than what the court imputed to him,[41] he would be presenting evidence that contradicted his own testimony in the first trial.[42]

failure to correct it will perpetuate a manifest injustice") (citations omitted). And even if the trial court erred in classifying the $64,000 parcel as entirely marital property, it does not appear to have erred in its classification of the Washington State property. Although the Washington State property was purchased using both marital and separate assets, there was no evident intent to maintain it, or a particular percentage of it, as separate property. *Cf. Compton v. Compton,* 902 P.2d 805, 811 (Alaska 1995) (holding, in spite of a premarital agreement to the contrary, that one party's commingling of separate and marital property showed an intent to make a "gift to the marital unit"). Furthermore, the approach that, in marriages of short duration, courts may "treat the property division as an action in the nature of rescission, aimed at placing the parties in, as closely as possible, the financial position they would have occupied had no marriage taken place" is inapplicable here. *Rose v. Rose,* 755 P.2d 1121, 1125 (Alaska 1988). The marriage at issue here lasted for nearly two decades, and the Forshees owned the Washington State property for over half of that time.

37. Jack testified that the property as a whole had been "for sale for [$]550,000 off and on for the last three years and they've never had a taker yet," but did not explain why he made no attempt to sell his interest at a lower price. Barring a serious defect in the property, common

sense suggests that Jack would have found a buyer long before the asking price reached zero.

38. *See Jones v. Jones,* 942 P.2d 1133, 1139 (Alaska 1997) (interpreting. AS 25.24.160(a)(2)(E), which permits courts in property division cases to take into account "the conduct of the parties, including whether there has been unreasonable depletion of marital assets").

39. *Cf. Pattee v. Pattee,* 744 P.2d 658, 660 (Alaska 1987), *overruled on other grounds by Nass v. Seaton,* 904 P.2d 412 (Alaska 1995) ("Our reading of the record leaves us with the definite and firm conviction that Richard intended to defraud Kim when [shortly before the divorce] he sold his interest in [a business held as marital property].").

40. Shan testified that the total value of the property was "[$]700 and some odd thousand."

41. Because of the superior court's stated goal of "divid[ing] the estate equally," Jack would only benefit from the recalculation of the value of an interest imputed to him if the recalculation yielded a lower value.

42. Unlike his argument regarding the PERS benefits, Jack does not claim that he was unfamiliar with any accounting concept that was necessary to determine the value of the Washington State property.

As noted above, "a party who fails to present sufficient evidence may not later challenge the adequacy of the evidence on appeal."[43] Here, if Jack wished to convey to the court that his interest was worth less than $100,000, he could have presented an appraisal, tax assessment, or other evidence to that effect. At the very least, he could have refrained from testifying that his interest was worth $175,000. Because the superior court's determination of the value of Jack's interest is not clearly erroneous, and because Jack waived the argument that his interest was worth less than $100,000 by admitting that it was worth seventy-five percent more, we affirm the judgment of the superior court with regard to the value of Jack's interest.

## F. PERS Account

Jack's next argument is that the superior court erred by failing to calculate the present value of Shan's vested PERS benefit. This court has held that

[t]he proper division of a vested pension can be accomplished in either of two ways. The court can either award a lump sum discounted to present value to one party or both, or retain jurisdiction and have payments made to the parties as retirement benefits come due.[44]

Although this court has remanded for a present value determination in at least one case where the appellant did not present evidence of present value below,[45] the parties are generally responsible for presenting evidence to the trial court.[46] Here, the parties stipulated to the value of Shan's retirement benefits, and presented an annual benefit statement as evidence.

As Shan points out, the parties effectively reached a "settlement" on the value of the PERS benefit. Settlements regarding the division of property are generally "controlling in the absence of fraud, duress, concealment of assets or other facts showing that the agreement was not made voluntarily and with full understanding."[47] Although the court admitted in its denial of Jack's motion for a partial new trial that it was unable to determine whether "the value used for the PERS was reduced [to present value] or whether that figure represented the balance at the time of the trial," there is no evidence that Jack was coerced or defrauded into stipulating to the value of the PERS benefit. In these circumstances, it appears that Jack had an agreement with Shan regarding the value of the PERS benefit, and that he waived any claim that he would otherwise have by stipulating to the value. For this reason, we hold that the superior court's valuation of the PERS benefit was not clearly erroneous.

## G. Business Debts

Finally, Jack claims that the court erred by not "revisit[ing]" his list of business

43. *Brotherton*, 941 P.2d at 1245 (quoting *Root*, 851 P.2d at 69).

44. *Hartland v. Hartland*, 777 P.2d 636, 641 (Alaska 1989). Determining the present value of state retirement benefits "entails applying a series of actuarial and investment assumptions relating to the employee's life expectancy and probable retirement age to the contractual or statutorily awarded benefit." *In re Marriage of Kelm*, 912 P.2d 545, 551 (Colo.1996) (citations and quotation marks omitted).

45. *See Miller v. Miller*, 739 P.2d 163, 166 (Alaska 1987) ("A potentially more serious valuation error is that the superior court did not discount to present value the retirement monies that Monte will receive when he reaches the age of 55. On remand, the parties should ... be required to submit evidence as to the present value of these funds, and the court should rely on the present value in fashioning the property division."); *but see MacCampbell v. MacCampbell*, Mem. Op. & J.

No. 1048 (Alaska, October 3, 2001), 2001 WL 34818261, at *1 n. 5 (affirming the trial court's acceptance of "the face value of [one spouse's] marital contributions to [his] PERS account, and not a present value determination" where "neither party challenged th[e] valuation at trial or on appeal").

46. *See Hartland*, 777 P.2d at 640 (noting that "a party who fails to present sufficient evidence at trial should not be allowed on appeal to challenge the inadequacy of evidence").

47. *Jordan v. Jordan*, 983 P.2d 1258, 1264 (Alaska 1999) (quoting *Notkin v. Notkin*, 921 P.2d 1109, 1111 (Alaska 1996)). Had the parties reached a settlement on the question of present value, the trial court could have accepted this settlement in lieu of the usual process of "(1) determining what assets are marital; (2) valuing those assets; and (3) equitably dividing the assets." *Id.* at 1263–64 (citing *Wanberg v. Wanberg*, 664 P.2d 568, 570 (Alaska 1983)).

debts, and thereby leaving debts of $46,245.92 out of its calculation of the marital estate. The list, which Jack had previously filed as a Property and Debt Worksheet, is marked as Exhibit 10, but was apparently never introduced at trial.[48] A retrial to consider new evidence is generally unwarranted unless the evidence at issue was "not ... discoverable, with due diligence, before trial."[49] As noted above, "it is the duty of the parties, not the court, to ensure that all necessary evidence is before the court in divorce proceedings."[50]

Here, the court did not prevent Jack from introducing the list of debts into evidence or mentioning the debts. Indeed, the court actively solicited additional evidence and arguments from Jack, and repeatedly asked if he had any additional issues to discuss. Jack responded more than once that he did,[51] and did in fact raise new issues, but at no point did he raise the additional business debts. The last two times that the court asked Jack if there was "anything else," Jack responded in the negative. Short of actually requiring Jack to introduce the exhibit, it is unclear what more the court could have done to obtain it. Because Jack declined repeated opportunities to introduce the list of business debts, and has not alleged that the evidence was not discoverable with due diligence at the time of trial, we affirm the judgment of the superior court on this issue.

## IV. CONCLUSION

For the reasons set forth above, we AFFIRM the judgment of the superior court.

---

**48.** The version marked as Exhibit 10 contains additional markings, not all of them legible.

**49.** *Sengupta v. Univ. of Alaska,* 21 P.3d 1240, 1261 (Alaska 2001) (discussing the standard for granting a new trial under Alaska Civil Rules 59 and 60(b)(2)).

**50.** *Brotherton,* 941 P.2d at 1245 (quoting *Root,* 851 P.2d at 69).

**51.** In one exchange, it is unclear whether Jack's response indicated that he had new issues to raise or that he wanted to "think about" whether he did.