Melanie GINN–WILLIAMS, Appellant,

v.

Channing O. WILLIAMS, Appellee.

No. S–11927.

Supreme Court of Alaska.

Sept. 8, 2006.

---

Melanie Ginn–Williams, pro se, Anchorage, Appellant.

No appearance by Appellee.

Before: BRYNER, Chief Justice, MATTHEWS, EASTAUGH, FABE, and CARPENETI, Justices.

## OPINION

BRYNER, Chief Justice.

## I. INTRODUCTION

Melanie Ginn–Williams and Channing O. Williams divorced after five years of marriage. At their trial, they agreed to share legal custody of their children and acknowledged that the superior court's acceptance of their agreement would be "final and binding." On appeal, Ginn–Williams challenges the court's denial of her motion to reconsider the shared legal custody award in light of new evidence offered to show that Williams had a history of domestic violence—evidence that might have triggered a statutory presumption disqualifying Williams from sharing legal custody. Ginn–Williams also questions the court's decision to award Williams a dependency exemption for their son (who is living with her, not with Williams), and its decision to treat two debts as marital property. We affirm, holding: (1) because Ginn–Williams offered no evidence of changed circumstances affecting the children's best interests, the superior court properly declined to reconsider its joint legal custody award;

(2) the disputed dependency exemption complies with federal and state law, even though Williams is a noncustodial parent; and (3) substantial evidence supports the superior court's rulings on marital debt.

## II. FACTS AND PROCEEDINGS

Melanie Ginn–Williams and Channing O. Williams married in 1999 and separated in August 2002. Their two children remained with Ginn–Williams, and the parties made informal arrangements for visitation by Williams. Williams filed for divorce in January 2004; the parties then engaged in some marital counseling. By October 2004, the parties' efforts to reconcile had apparently stalled, and Superior Court Judge Sharon L. Gleason scheduled the case for a trial to begin in January 2005. Judge Gleason tried the case in three separate hearings held in January, March, and April 2005. Throughout the superior court proceedings, both parties appeared pro se.

At the January 2005 hearing, the court mainly considered issues of custody and visitation. The parties arrived at an agreement that allowed Ginn–Williams to keep primary physical custody of both children, established a visitation schedule for Williams, and provided for shared legal custody. After finding the agreement to be in the children's best interests, the superior court accepted it as a "final and binding" determination of the custody issues.

Less than a week later, Ginn–Williams moved for reconsideration of the decision allowing Williams to have joint legal custody, alleging for the first time that Williams had a history of domestic violence and that, under a recently enacted law, the court was obliged to consider this history before deciding the legal custody issue.

At the March 2005 hearing, the superior court denied Ginn–Williams's motion for reconsideration, declining to revisit its shared-legal-custody order. The court noted that the order reflected a voluntary and binding agreement; that both parties had acknowledged that the agreement would be in the children's best interests; and that Ginn–Williams's motion for reconsideration failed to make any showing that shared legal custody would prove unworkable or that it might not serve the children's best interests.

Apart from denying the motion for reconsideration, the court mainly used the March hearing to address issues of child support. After it became clear that neither party had all their required financial documentation, the court postponed further consideration of child support until early April, when another hearing had already been set to consider unresolved property issues.

The court resolved the remaining issues of child support and property division at the April 2005 hearing. It decided, among other things, that Williams could claim a federal income tax dependency exemption for the couple's older child; that the second mortgage for the parties' marital home was a marital debt; and that an automobile loan the parties had received to buy a minivan was also a marital debt. The superior court incorporated these rulings in the divorce decree.

Ginn–Williams now appeals.[1]

## III. DISCUSSION

### A. Denial of Motion To Reconsider Legal Custody Award

■ Ginn–Williams initially challenges the superior court's order denying her motion to reconsider the court's decision awarding joint legal custody, resting her challenge on the evidence she presented below to show that Williams had a history of domestic violence. Ginn–Williams argues, as she did below, that the court was required to consider this evidence because recently enacted amendments to AS 25.24.150 create "a rebuttable presumption that a parent who has a history of perpetrating domestic violence against the other parent . . . may not be awarded . . . joint legal custody[.]"[2]

> There is a rebuttable presumption that a parent who has a history of perpetrating domestic violence against the other parent, a child, or a domestic living partner may not be awarded

---

1. Williams has not entered an appearance or filed a brief in response to Ginn–Williams's appeal.

2. AS 25.24.150(g) provides:

■ Our review of the record convinces us that this argument is unpersuasive.[3] At the outset of the January 2005 hearing, the superior court and the parties informally discussed custody and visitation issues with a view toward reaching an agreement. Neither party had expressed any interest in altering the existing physical custody arrangement, under which Ginn–Williams exercised primary custody of both children. Ginn–Williams and Williams eventually agreed upon a detailed visitation schedule for Williams. The court then informed the parties that they also needed to address the issue of legal custody, which neither Ginn–Williams nor Williams had evidently specifically addressed. After the court described the concept of legal custody and explained what it actually entails, the parties agreed upon shared legal custody.

Since the parties seemed to have agreed on all custody and visitation issues, Judge Gleason proceeded to summarize the agreement's terms. The judge then formalized the agreement by placing Ginn–Williams and Williams under oath, asking each of them separately whether they understood the agreement, and inquiring whether both parties believed that it would serve the children's best interests. Williams answered yes to both questions. Ginn–Williams initially hesitated, expressing some reservations regarding Williams's ability to abide by the visitation schedule; but after discussing her concerns with Judge Gleason and receiving further clarification, Ginn–Williams assured the judge that she understood the agreement, was "willing to try it," and believed that it would serve the children's best interests.

Judge Gleason then addressed the parties once more to ensure that they understood the agreement and accepted its terms; the judge emphasized that, once the court ac-

cepted the agreement, it would be "pretty much in concrete"—"final and binding." Ginn–Williams and Williams both reassured the court that they understood, and believed that the agreement would be in the children's best interests. Judge Gleason then gave the court's formal approval: "All right, then, it sounds like you've got … a final and binding agreement of the custody issues."

Five days after the January 26 hearing, Ginn–Williams filed a motion to reconsider the order granting shared legal custody. Although neither party had previously mentioned any domestic violence problems and their pleadings were silent on the issue,[4] Ginn–Williams alleged that the parties had a history of domestic violence in their relationship and that under the recently enacted provisions of AS 25.24.150(g), the court should have considered this history before entering the shared-legal-custody order.

Judge Gleason addressed Ginn–Williams's motion at the next hearing, on March 7, 2005. After noting Alaska's traditional preference for keeping both parents involved in the limited types of basic decisions encompassed by the right to exercise legal custody, the judge asked, "I guess my question is: why do you think that you and Mr. Williams couldn't make that type of—those types of decisions together?" In response, Ginn–Williams disclosed that, upon recently visiting the family law self help center, she had realized that, because Williams had a history of domestic violence, the new law would not allow him to have legal custody. Ginn–Williams went on to say that the trouble she foresaw with shared legal custody was that, during the period of their separation, Williams had been hard to reach and slow to answer when questions arose concerning the children: "Now, we do not get along. If I call him, it takes

---

sole legal custody, sole physical custody, joint legal custody, or joint physical custody of a child.

**3.** We generally review custody decisions and accompanying best-interests determinations for abuse of discretion. *See, e.g., McClain v. McClain,* 716 P.2d 381, 384 (Alaska 1986). But we apply de novo review to determine whether the trial court used the correct legal standard in

reaching its decision. *Moeller–Prokosch v. Prokosch,* 27 P.3d 314, 316 (Alaska 2001).

**4.** Ginn–Williams's comments at the March 7 hearing suggested that she had raised the issue of domestic violence in her answer to Williams's complaint. But our review of Ginn–Williams's answer and the paperwork that accompanied the answer reveals no mention of the issue.

him three or four days to return the phone call. For any decision."

Judge Gleason expressed doubt as to whether the recently amended law would apply, noting that the alleged incidents of domestic violence had occurred before the amendment's effective date. The judge then proposed a "middle-ground" arrangement that would enable both parents to participate in decisions concerning the children's school and their medical care, while giving Ginn–Williams authority to make those decisions on her own if Williams proved to be non-responsive or unavailable. When asked, "Is that something you might see as workable here?" Ginn–Williams replied, "That might be workable, 'cause, I mean, in past and present I have called him, tried to involve him, and it just takes him days to be back with me[.]" But when pressed to decide whether she might be willing to try a shared legal custody arrangement that would give her "the final say if you tried to reach him and ... you couldn't ... hear back from him," Ginn–Williams answered that she would "rather just be able to make the decision myself."

After considering Ginn–Williams's position, Judge Gleason decided to deny the motion to reconsider the legal custody order. In reaching this decision, Judge Gleason pointed out that her order incorporated an agreement that both parties had accepted as a workable resolution of the legal custody issue—a resolution that would be in their children's best interests. At the same time, the judge emphasized that she would be willing to revisit the issue if she saw any sign that the shared custody arrangement might actually be turning out to be problematic:

> [W]hat I've said is that, if this doesn't work, we're going to change it. But if it can work, your children are going to be better off. And I am going to rely on your testimony that you thought it could work. And it, and it effectively has.... [T]he two of you have been separated for two and a half years, and I can only assume there've been difficulties, I mean most people sepa-

rating have had difficulties. But ... what I see from the two of you is very little which ... means that I have higher hope for your ability, for your children's sake, to work things out. But if you can't, we're going to make changes. That's—that's what I am saying here.

Judge Gleason further expressed the opinion that AS 25.24.150(g) did not preclude this conclusion. In the judge's view, the new statute did not automatically override the parties' agreement and, in any event, it might not apply to domestic violence occurring before its enactment.[5]

On this record, we conclude that Ginn–Williams's belated attempt to invoke AS 25.24.150(g), did not require the court to reopen the legal custody issue. At the January 26 hearing the court had resolved all pending custody issues based on an agreement that both parties believed would be workable and would serve their children's best interests. When the court incorporated the agreement in its custody decision, Ginn–Williams understood that the custody ruling would be "final and binding." Her subsequent motion for reconsideration did not dispute this point; nor did it assert that she had acted involuntarily or that she had been pressured, confused, or misled in any respect.

To be sure, Ginn–Williams did contend at the March hearing that she had been unaware of the new domestic violence provision when the agreement was accepted. But the new law's existence did not by itself amount to a changed circumstance requiring the court to revisit its decision. As already mentioned, before filing her motion for reconsideration, Ginn–Williams never alleged that domestic violence played any role in the parties' divorce or that it might have any effect on the pending custody issues. Moreover, as the superior court noted, during their two-plus years of pre-divorce separation, the parties had managed to share legal custody of their children on an informal basis without ever encountering an insurmountable problem.

---

**5.** Our decision that the statute does not automatically trump a voluntary custody agreement makes it unnecessary to consider whether AS

25.24.150(g) applies to conduct occurring before the provision's effective date.

And even after alleging that Williams had a history of domestic violence, Ginn–Williams never established any obvious link between Williams's alleged history of violence and her reasons for wanting to have sole legal custody. To the contrary, the potential problems Ginn–Williams predicted at the March 7 hearing were essentially the same ones she described before agreeing to share legal custody at the January 26 hearing: during their two years of separation, Williams had simply been hard to reach and slow to respond when questions concerning the children arose.

Considering the totality of these circumstances, we see no legal error or abuse of discretion in the superior court's refusal to reopen its custody determination on the sole basis of the new statute's existence. Alaska law has traditionally encouraged parties to resolve custody disputes amicably,[6] and we have rarely hesitated to enforce parties' custody agreements when they appeared to further the children's best interests.[7] Based on a careful consideration of the evidence before her, Judge Gleason had expressly found that the parties' agreement in this case would serve the children's best interests. Having made that decision, Judge Gleason could properly find that, absent any apparent connection between Williams's alleged history of domestic violence and Ginn–Williams's reasons for seeking sole legal custody, her late invocation of AS 25.24.150(g) did not justify restructuring the parties' "final and binding" agreement.[8]

## B. Award of Dependency Exemption to Williams

■ Ginn–Williams next challenges the superior court's decision to allow Williams to claim a federal tax dependency exemption for the couple's son, who lived with Ginn–Williams. She claims that this ruling violates federal law. Specifically, Ginn–Williams argues that under federal law only primary physical custodians can lawfully claim dependency exemptions.

But this claim lacks merit. The federal tax code provisions that directly control this issue are 26 U.S.C. §§ 151(c) and 152(e).[9] Subsection 151(c) specifically allows an individual taxpayer to claim an additional exemption "for each individual who is a dependent," as that term is defined in § 152.[10] Subsection 152(e)(1), in turn, defines a "dependent" to include a child of a noncustodial divorced parent who (a) is primarily supported by the

6. See, e.g., An Act Relating to Child Custody, ch. 88, § 1(b), SLA 1982 ("[I]t is in the best interests of a child to encourage parents to implement their own child care agreements outside of the court setting."); see also Crane v. Crane, 986 P.2d 881, 889 (Alaska 1999) ("The legislature recognized these effects when it found that it is in the best interests of children to have their own parents fashion custody agreements rather than have courts impose custodial regimes upon them.").

7. See, e.g., Crane, 986 P.2d at 889 (commenting on need to encourage custody agreements "in a system where litigation is both expensive and, in the context of child custody disputes, emotionally debilitating" and observing that a contrary holding would have a "counterproductive" effect by "discourag[ing] settlement and defeat[ing] settlement efforts").

8. Regarding the superior court's custody order, Ginn–Williams also briefly argues that Judge Gleason erred by directing both parties not to consume alcohol within twelve hours of having contact with the children. Because Williams was the one with the drinking problem, Ginn–Williams alleges, "[t]he judge took away Ms. Ginn–Williams's right to consume alcohol." But the record reveals that Judge Gleason imposed this mutual restriction only after both parties expressly agreed to have it added to the terms of their visitation agreement. Since Ginn–Williams points to nothing in the record suggesting that she later asked the superior court to rescind the restriction, we find no error on this point.

9. In support of her argument, Ginn–Williams cites IRS Publications 504 and 929, two worksheets designed to help taxpayers in claiming exemptions. Because these publications are based on 26 U.S.C. §§ 151(c) and 152(e) and have no independent legal significance, our analysis here relies directly on the tax code provisions.

10. 26 U.S.C. § 151, "Allowance of deductions for personal exemptions," provides, in relevant part:

(a) Allowance of deductions.—In the case of an individual, the exemptions provided by this section shall be allowed as deductions in computing taxable income.

. . . .

(c) Additional exemption for dependents.—An exemption of the exemption amount for each individual who is a dependent (as defined in section 152) of the taxpayer for the taxable year.

income of one or both divorced parents; (b) lives with one or both of the parents for more than one-half of the year; and (c) meets the requirements of § 152(e)(2). Subsection 152(e)(2) provides that its requirements will be met for a noncustodial parent of a child if that parties' divorce decree provides that "the noncustodial parent shall be entitled to any deduction allowable under section 151 for such child." [11]

Here, the divorce decree issued by the superior court expressly provided that, after 2004, Williams would be entitled to receive the additional exemption allowed under § 151(c):

> Ms. Ginn–Williams is entitled to claim both of the children as dependents on her 2004 federal income tax return. Thereafter, Father may claim the parties' older child as a dependent so long as he is not more than 4 months in arrears on his child support obligation as of December 31 for that year. When the parties' oldest child can no longer be claimed as a dependent, the parties shall alternate claiming the parties' younger child, with Ms. Ginn–Williams to be able to claim that child first.

Williams's son was thus a "qualifying child" who could be claimed as a dependent by his noncustodial parent under § 152(e)(1), since: (a) the child was primarily supported by the income of one or both divorced parents; (b) the child lived with one or both of his parents for more than one-half of the year; and (c) the divorce decree met the requirements of § 152(e)(2)—in other words, the decree expressly allowed Williams to have the exemptions.

Ginn–Williams separately claims that the dependency exemption fails to comport with Alaska law by violating AS 25.24.152. But Ginn–Williams's reliance on this provision is equally unavailing. Alaska Statute 25.24.152(a) expressly authorizes courts to "grant a noncustodial parent the right to claim a child as a dependent under federal tax laws for a tax year if the noncustodial parent satisfies the requirements of federal law and was not in arrears at the end of the tax year in an amount more than four times the monthly obligation." As we have seen, Williams satisfied the requirements of federal law with respect to the disputed exemption. And the divorce decree specifically limited his right in the manner required by AS 25.24.152(a) by providing that he could claim the exemption for any given year only "so long as he is not more than 4 months in arrears on his child support obligation as of December 31 for that year."

Thus, in awarding the additional exemption to Williams, the superior court complied with both federal and state law.

### C. Property Division

 Ginn–Williams's final claim is that the superior court erred in classifying the

---

11. 26 U.S.C. § 152(e) (2004) (amended 2005). The relevant text of § 152(e) is as follows:

(e) Special rule for divorced parents, etc.—

(1) In general. . . . [I]f

(A) a child receives over one-half of the child's support during the calendar year from the child's parents—

(i) who are divorced or legally separated under a decree of divorce or separate maintenance,

... and

(B) such child is in the custody of 1 or both of the child's parents for more than one-half of the calendar year, *such child shall be treated as being the qualifying child* or qualifying relative *of the noncustodial parent* for a calendar year *if the requirements described in paragraph (2) are met.*

(2) Requirements.—For purposes of paragraph (1), *the requirements* described in this paragraph *are met if*—

(A) *a decree of divorce* or separate maintenance or written separation agreement be-

tween the parents applicable to the taxable year beginning in such calendar year *provides that*—

(i) *the noncustodial parent shall be entitled to any deduction allowable under section 151 for such child,* or

(ii) the custodial parent will sign a written declaration (in such manner and form as the Secretary may prescribe) that such parent will not claim such child as a dependent for such taxable year, or

. . . .

(3) Custodial parent and noncustodial parent.—For purposes of this subsection—

(A) Custodial parent.—The term "custodial parent" means the parent with whom a child shared the same principal place of abode for the greater portion of the calendar year.

(B) Noncustodial parent.—The term "noncustodial parent" means the parent who is not the custodial parent.

(Emphasis added.)

parties' second mortgage and auto loan as marital debts. She argues that both debts were the separate property of Williams. But in our view, the record supports the trial court's ruling.[12]

Evidence presented to the superior court indicated that Williams took out a loan from Denali Alaskan Federal Credit Union in 2000 to buy a Mazda MPV minivan for Ginn–Williams to use. In late 2003, after the parties had separated, Williams surrendered the minivan to the credit union to help pay off the loan; this left an outstanding balance of about $8,000. The superior court considered this obligation to be "clearly ... a marital debt." Ginn–Williams nevertheless argues that the loan was Williams's property because her name was not on the loan and because Williams had control of the minivan when he returned it to the bank.

■ But "[m]arital property includes all property acquired during the marriage 'excepting only inherited property and property acquired with separate property which is kept as separate property.'"[13] We have also held that, "[a]bsent any showing that the parties intended a debt to be separate, the trial court must presume that a debt incurred during the marriage is marital and should consider it when dividing the marital estate."[14] Here, the parties incurred the disputed debt during the marriage. Moreover, Williams testified that he bought the minivan for Ginn–Williams to drive, that she was the primary user, and that she joined, or at least acquiesced, in the decision to surrender it to help repay the loan. Ginn–Williams points to no evidence suggesting an intent to keep the debt separate besides Williams's name on the note, and the fact

that he physically returned the minivan to the credit union. On this record, because Williams's testimony provides substantial evidence to support the trial court's ruling, we find no clear error or abuse of discretion in treating the loan as a marital debt.

■ Ginn–Williams similarly argues that the superior court erred in treating the second mortgage on the marital residence as a marital debt. Although she acknowledges that the residence itself became marital property because Williams added her name to the title after they married, Ginn–Williams points out that Williams obtained the second mortgage in his name shortly before the marriage and never added her name to the note. Ginn–Williams reasons that, under these circumstances, the home became marital property but Williams remained the sole owner of the underlying debt. The superior court disagreed, ruling that the debt accompanied the home and that both transmuted into a unitary marital asset during the marriage.

■ Again, substantial evidence supports this ruling, so we find no clear error. Whether an initially nonmarital debt transmutes into a marital liability is a question of intent and acceptance.[15] Here, the home was Williams's separate property when he obtained the second mortgage shortly before the marriage. According to Williams, both parties used the mortgage proceeds to pay off their respective credit card debts. After the marriage, Williams added Ginn–Williams's name to the title; the parties lived in the home together, and regarded it as their marital residence. There is no indication that Williams made postmarital pay-

---

12. We review a trial court's decision classifying property in a divorce action for abuse of discretion; but we review factual findings the court makes to support its decision for clear error. *See Abood v. Abood,* 119 P.3d 980, 984 (Alaska 2005) ("a finding that the parties intended to treat property as marital will be disturbed only if it is clearly erroneous"); *cf. Veselsky v. Veselsky,* 113 P.3d 629, 632 (Alaska 2005) ("The determination of what property is marital is reviewed for an abuse of discretion although the classification of some items may present a question of law to which we apply our independent judgment.").

13. *Hansen v. Hansen,* 119 P.3d 1005, 1009 (Alaska 2005) (quoting *Lewis v. Lewis,* 785 P.2d 550, 558 (Alaska 1990)).

14. *Veselsky,* 113 P.3d at 636; *see also Leis v. Hustad,* 22 P.3d 885, 889 (Alaska 2001).

15. *See* BRETT R. TURNER, 2 EQUITABLE DISTRIBUTION OF PROPERTY § 6:97 *Debts–Classification of debts* (3d ed. 2005) ("Nonmarital assets can become[ ] marital assets if the owner makes an express or implied gift to the marital estate. Under the same theory, a nonmarital debt can become marital if the non-incurring spouse agrees to accept liability.").

ments on the mortgage with nonmarital funds.

Given this evidence, the trial court could properly conclude that when the home transmuted to marital property, the mortgage transmuted too, because the parties showed no clear intent to keep the debt separate.[16] In other words, as Judge Gleason put it, "When you bring an asset into the marriage, [you bring in] both the good and the bad." [17]

Because the record supports the court's rulings on marital debt, we affirm the superior court's decision to treat both the auto loan and the second mortgage as marital debts.

## IV. CONCLUSION

For these reasons, we AFFIRM the superior court's judgment.

---

**16.** *Cf. Chotiner v. Chotiner,* 829 P.2d 829, 832–33 (Alaska 1992) ("Separate property can become marital property where that is the intent of the owner and there is an act or acts which demonstrate that intent. For example, separate real estate can become marital where the owner permits the non-owner spouse to lend her credit to improve the property, or to devote substantial efforts to its management, maintenance or improvement, or where the parties use the premises as their personal residence."); *Schmitz v. Schmitz,* 88 P.3d 1116, 1128 (Alaska 2004) ("[P]lacing separate property in joint ownership is rebuttable evidence that the owner intended the property to be marital.").

**17.** Although we recognize that the classification of a secured debt does not necessarily hinge on the character of the underlying security, *see* TURNER, 2 EQUITABLE DISTRIBUTION OF PROPERTY § 6:97, it seems reasonable to infer that, in the absence of evidence clearly establishing a specific intent to treat the debt separately, when a solely owned premarital home becomes the marital residence and transmutes, the accompanying debt ordinarily transmutes with it. *Cf.* TURNER, 2 EQUITABLE DISTRIBUTION OF PROPERTY § 6:97 ("The definition of joint benefit for purposes of [the rule that 'a marital debt is any debt incurred during the marriage for the joint benefit of the parties'] does not require that both spouses directly benefit from every single marital obligation.").