James R. PARTRIDGE, Appellant,

v.

Erlinda PARTRIDGE, Appellee.

No. S–13256.

Supreme Court of Alaska.

May 21, 2010.

Rehearing Denied Oct. 4, 2010.

Donna C. Willard, Law Offices of Donna C. Willard, Anchorage, for Appellant.

Herman G. Walker, Jr., and Linda A. Limón, Limón & Walker, Anchorage, for Appellee.

Before: CARPENETI, Chief Justice, FABE, WINFREE, and CHRISTEN, Justices.

*OPINION*

CHRISTEN, Justice.

## I. INTRODUCTION

James and Erlinda Partridge obtained a final decree of divorce in June 2008. James appeals the trial court's property division which allocated cash and income-expending assets to him and the marriage's most significant cash-producing asset to Erlinda. He argues that the trial court's allocation violates AS 25.24.160(a)(4), which requires that property divisions "fairly allocate the economic effect of divorce." James also claims the trial court erred by mischaracterizing assets, failing to value each party's pension, and failing to consider his contributions of separate property to the marriage. Because the trial court's property division was not an abuse of discretion, we affirm it. But we remand for further proceedings because the trial court did not credit James for some of the marital debts he paid during the separation period, and because the trial court credited both parties with the full value of marital pension payments they received during the separation period without determining whether they spent these funds on normal living expenses.

## II. PROCEEDINGS

James and Erlinda Partridge were married in 1987. Erlinda filed a complaint for legal separation in February 2006 and con-

verted it into a complaint for divorce in May of that year.

The case was tried in December 2007 and April 2008. The trial court determined that the legal date of separation was June 30, 2006, that a fifty/fifty property division was appropriate, and that the total value of the marital estate was $7,666,445. The court awarded James assets valued at $3,667,251 and Erlinda assets totaling $4,013,130 and ordered Erlinda to make an equalizing payment of $172,940 to James by December 31, 2009. If Erlinda made the equalizing payment after December 31, 2009, it was to be subject to 7.75% interest retroactive to April 28, 2008. Both parties filed motions for reconsideration which the trial court denied. James appeals.[1]

## III. FACTS

The Partridges accumulated a substantial estate during their marriage. James retired from his job as a pilot for Northwest Airlines in 1996 with a monthly pension of $6,784. Erlinda retired in 2001 after working for thirty-three years as a flight attendant. She receives an annuity payment of $789 per month attributable to pre-marital employment. This annuity will continue indefinitely. She also receives a monthly pension payment of $1,312 that will cease when she turns sixty-five and becomes eligible for social security. At trial, Erlinda was sixty-one years old and James was sixty-nine. No children were born during their marriage, and the superior court observed that both parties were in "basically good health."

### A. Kent Corporate Park

The Partridges owe much of their prosperity to an investment in four warehouses located in Kent, Washington known as "Kent Corporate Park" (KCP). The four buildings sit on two separate parcels. Lot three con-

tains buildings "A" and "B" with approximately 65,601 square feet of rentable space and a monthly base rent of $28,168. Lot four contains buildings "C" and "D" with 72,553 square feet of rentable space and a monthly base rent of $32,837. The two lots were separately owned until 1998 when the Partridges' predecessor-in-interest purchased them. If the two parcels had been owned separately at the time of trial, the owner of lot four would have needed an easement across lot three to access the only available road.

The Partridges acquired KCP in 2001. The acquisition was the culmination of two tax-exempt exchanges spanning the previous decade, with each exchange resulting in ownership of an investment property of successively greater value.[2] The trial court adopted Erlinda's $9,027,288 valuation of KCP. At this value, KCP had a total divisible equity of $3,541,375. James never actively disputed KCP's status as marital property at trial; he referred to it as "held jointly" and as a "marital asset" on several occasions.

Although KCP's equity comprises half of the marital estate, it produced nearly two-thirds of the Partridges' monthly income at the time of trial.[3] A manager handled the day-to-day operation of the warehouses and performed "[n]inety-eight percent" of the business management for KCP during the marriage. Notably, six-figure maintenance burdens such as a roof replacement and flooding repairs created negative cash flow for KCP in some recent years.

James had exclusive access and control over income from KCP during the separation period. This included his unilateral settlement of a lawsuit arising from a tenant's environmental contamination of part of KCP for $400,000. James did not inform Erlinda of the settlement amount until compelled to do so by the court.[4] He spent much of the

---

1. James's appellate counsel did not represent him at trial.

2. The Partridges purchased KCP with a mortgage and an Internal Revenue Code § 1031 tax-free exchange of equity from a Seattle apartment complex they owned.

3. The parties' monthly income also included their pension payments and James's social security payments.

4. James claims to have submitted the KCP contamination settlement information to his attorney who, he alleges, failed to convey the information to opposing counsel. James's attorney attributed the belated disclosure of the settlement agree-

approximately $259,000 in net settlement proceeds to purchase property in Wasilla. James also took twenty-two monthly draws of $8,000 each and $120,000 of additional draws from KCP during the separation period. Erlinda received no income from KCP during this time and testified that she borrowed funds from family members to pay her living expenses. The trial court awarded KCP entirely to Erlinda.

## B. Wasilla Property

In the summer of 2006, James purchased a home and several residential lots on Lake Lucille in Wasilla. James used income from KCP to make a down payment on the home and to purchase two adjoining lots. Erlinda co-signed on the note for the purchase of the house, but not on the adjacent lots. She testified that she signed for the house because "[James] couldn't buy the Lake Lucille house without my signature.... I agreed to sign so he could have a place to heal." James testified that the house and lots were marital property because he had hoped at the time of purchase that he and Erlinda would reconcile and live together in a new home built on one of the lots.[5]

While living on the Lake Lucille property prior to and during trial, James spent nearly $70,000 on mortgage payments and insurance for the Lake Lucille home. He also used approximately $67,000 to renovate it and improve the adjoining lots. These improvements were made without consulting Erlinda and using funds over which she had no control, but James characterized them as marital expenses.

In his closing argument, James again characterized the Lake Lucille home and adjacent lots as marital property, but he asked that the court award them to him so he could continue living there. The trial court determined that the house and adjacent lots were James's separate property. The court explained:

> Although Ms. Partridge's name is on the house, she's not on the adjoining lots. And

it's clear to me from the testimony that the Wasilla home was not intended to be a joint investment by the parties.

> Mr. Partridge has made a number of improvement[s] on the property where he seeks to reside, but those were not improvements that were made as joint decision[s], to cut down trees and put in doors and other things. Those were decisions that he made for property that he alone has resided in. So I don't see that the Wasilla property and adjacent lots should be considered to be a marital estate— marital assets. And that's consistent with the June '06 separation date.

The trial court found "there has been depletion of the marital estate by Mr. Partridge in the purchase of the Wasilla home and the considerable funds that he spent there." The court recaptured those funds by treating them as a prior cash distribution to James in its accounting.

## C. Yamhill Investment Property

The couple's third significant asset is approximately sixty-five acres of undeveloped land in Yamhill County, Oregon with a stipulated value of $1,459,557. James and Erlinda owned the Yamhill property "free and clear" at the time of trial.

In June 2005 James contracted with Al Nordgren to develop the Yamhill property. The agreement provided that Nordgren would submit a zoning change application to allow for subdivision and development of the property. If the rezoning application is successful, Nordgren will receive fifty percent of the net profit realized from the investment. Nordgren will receive nothing if the rezoning application is not approved within two years of its submission.

At trial, James argued that Yamhill should be equitably divided between the parties with the goal of "fairly allocat[ing] both the risk and the benefit of ownership of [Yamhill]." The trial court awarded Yamhill solely to James, finding that he had a far better demonstrated ability to develop it.

---

ment to Erlinda's counsel's failure to pursue the issue in discovery.

5. James testified that he "thought [Erlinda] wanted to live out there, we were planning on building a house on one of the lots."

## IV. STANDARD OF REVIEW

■ We review the trial court's judgment in property division cases for abuse of discretion as provided by AS 25.24.160(a)(4).[6] Property division involves a three step process in which the trial court "determin[es] what property is available for distribution, assess[es] its value, and allocat[es] it equitably."[7]

■ We review step one, characterizing the property as separate or marital,[8] "under the abuse of discretion standard, although it may involve legal determinations to which this court applies its independent judgment."[9] An abuse of discretion occurs where the court "considers improper factors, fails to consider relevant statutory factors, or assigns disproportionate weight to some factors while ignoring others."[10] All assets acquired during the marriage become marital property "excepting only inherited property and property acquired with separate property which is kept as separate property."[11]

■ We review step two, placing a value on the property, as a factual determination that we will upset only upon a showing of clear error.[12] Reversal for clear error requires that we find ourselves "left with a definite and firm conviction on the entire record that a mistake has been made."[13]

■ We review step three, allocating the property equitably, under the abuse of discretion standard.[14] We will not disturb the trial court's allocation unless it is clearly unjust.[15]

## V. DISCUSSION

### A. The Court's Characterization of the Partridges' Assets Was Not An Abuse of Discretion.

#### 1. James waived the argument that KCP is his separate property by failing to raise it in the trial court.

■ James argues on appeal that KCP is his separate property, but this argument bears little resemblance to his trial court presentation. James expressly waived this argument by affirmatively characterizing KCP as a marital asset both in open court and in several filings, including his Supplemental Trial Brief and his written closing argument. "We will not consider arguments that parties fail to raise in the lower court, let alone arguments they have conceded below, unless the trial court committed plain error."[16] Because we find that no plain error was committed—error "so prejudicial that failure to correct it will perpetuate a manifest injustice"[17]—we affirm the lower court's classification of KCP as a marital asset.

#### 2. The trial court's classification of the Lake Lucille home and lots as James's separate property was not an abuse of discretion.

Following separation, James moved out of the marital home in Anchorage and into the home he purchased on Lake Lucille in Wasil-

6. *Walker v. Walker*, 151 P.3d 444, 447 (Alaska 2007) (citing *Moffitt v. Moffitt*, 749 P.2d 343, 346 (Alaska 1988)).

7. *Forshee v. Forshee*, 145 P.3d 492, 497 (Alaska 2006) (quoting *Fortson v. Fortson*, 131 P.3d 451, 456 (Alaska 2006)).

8. *Wanberg v. Wanberg*, 664 P.2d 568, 570 (Alaska 1983).

9. *Walker*, 151 P.3d at 447 (quoting *Moffitt*, 749 P.2d at 346).

10. *Hansen v. Hansen*, 119 P.3d 1005, 1009 (Alaska 2005) (citing *West v. West*, 21 P.3d 838, 841 (Alaska 2001)).

11. *Id.* (quoting *Lewis v. Lewis*, 785 P.2d 550, 558 (Alaska 1990)).

12. *Walker*, 151 P.3d at 447 (quoting *Moffitt*, 749 P.2d at 346).

13. *Hansen*, 119 P.3d at 1009 (citing *Martens v. Metzgar*, 591 P.2d 541, 544 (Alaska 1979)).

14. *Id.* (quoting *Moffitt*, 749 P.2d at 346).

15. *Id.*

16. *Tybus v. Holland*, 989 P.2d 1281, 1285 (Alaska 1999) (citing *Wettanen v. Cowper*, 749 P.2d 362, 364 (Alaska 1988)).

17. *Forshee v. Forshee*, 145 P.3d 492, 500 n. 36 (Alaska 2006) (quoting *Hosier v. State*, 1 P.3d 107, 112 n. 11 (Alaska App.2000) (citations omitted)).

la. James spent hundreds of thousands of dollars on this home, the adjacent lot, and on improvements in violation of a standing injunction prohibiting the parties from "dispos[ing] of, encumber[ing], transfer[ing], or dissipat[ing] any marital property without written consent of the other party or an order from the court." The trial court found that James had engaged in a "depletion of the marital estate" by using income from KCP to purchase the Lake Lucille properties and other lots in the Wasilla area. The court characterized these properties as James's separate property, and charged James with receiving a $776,836 advance of marital funds he had spent on them. James argues that if the KCP income is deemed marital, the trial court committed plain error by characterizing the Wasilla properties as his separate property.

The real property James purchased can be divided into two groups: property acquired before June 30, 2006—the court-determined date of separation—and property acquired after that date. The Lake Lucille home and an adjoining lot were purchased in June 2006. James argues that these properties fit the definition of marital property—property acquired during marriage[18]—because they were acquired before the separation date using marital funds drawn from KCP. We have held that the relevant factors for "determining whether property should be characterized as marital are ... (1) the use of property as the parties' personal residence ..., (2) the ongoing maintenance and managing of the property by both parties, (3) placing the title of the property in joint ownership and (4) using the credit of the non-titled owner to improve the property."[19]

Applying the facts to this legal framework, we find that the trial court did not abuse its discretion by finding the Lake Lucille home and lot were James's separate property. Erlinda presented evidence regarding the first and second factors. James testified that Erlinda never intended to live at the Lake Lucille home, never owned a key to the home, and never spent a night there. As to the third factor, Erlinda explained that the Lake Lucille home was titled jointly because "[James] couldn't buy [it] without my signature" and "[I] agreed to sign so he could have a place to heal." We also believe it is significant that James's expenditures violated the February 22, 2006 pre-trial order, which prohibited both parties from using "marital funds or assets except for ... immediate, personal, and necessary living expenses." A party may not disregard an injunction prohibiting the use of marital funds, then strategically characterize the assets acquired in violation of the court order to their advantage.

James's argument that the other Wasilla properties—those purchased after the date of separation—are marital relies on the rule that assets acquired after separation can be deemed marital property if they are acquired with marital property.[20] The totality of the evidence, including Erlinda's testimony, supports the court's characterization of this asset. Erlinda never intended to live on or near the properties, her name was not on the titles, and James decided to purchase them unilaterally. His purchase of the other Wasilla properties amounted to conversion of marital assets into a non-marital form.[21]

The trial court did not err by recapturing the KCP cash distributions James used to

---

18. *Hansen,* 119 P.3d at 1009 (Alaska 2005).

19. *Beal v. Beal,* 88 P.3d 104, 121 (Alaska 2004) (internal citations omitted).

20. *Bousquet v. Bousquet,* 731 P.2d 1211, 1217 n. 14 (Alaska 1987) ("[A]ssets acquired subsequent to separation are not considered marital property absent evidence that the spouse used marital property to obtain them."); *Schanck v. Schanck,* 717 P.2d 1, 3 (Alaska 1986).

21. We note that the trial court characterized James's purchase of the Wasilla properties as "unreasonable depletion of the marital estate." We do not believe this characterization is techni-

cally correct. The term "depletion" is generally reserved for cases where one spouse used marital property for his or her own benefit with the intent to deprive the other spouse of his or her share of the marital property. *See Jones v. Jones,* 942 P.2d 1133, 1140–41 (Alaska 1997). James's conduct is better described as converting marital assets to a non-marital form. But under either characterization, the result is the same: our cases support recapture where marital assets have been dissipated or converted to a non-marital form. *Foster v. Foster,* 883 P.2d 397, 400 (Alaska 1994).

buy the Wasilla properties. We have held that "[w]here there is evidence that a marital asset was dissipated, wasted, or converted to a non-marital form, the court can 'recapture' the asset by giving it an earlier valuation date and crediting all or part of it to the account of the party who controlled the asset."[22] The trial court recaptured the funds James spent purchasing and improving the Wasilla properties by crediting him with receipt of the KCP income he invested in this real estate.

Finally, James contends that the trial court erred by charging him with all of the marital funds he spent purchasing and improving the Wasilla properties. He argues that his expenditures were made for a valid marital purpose and therefore no dissipation, waste, or conversion of marital assets occurred. But the same evidence that supports the trial court's conclusion that the Lake Lucille properties were James's separate property supports the conclusion that the funds were not spent for a marital purpose. With the exceptions identified in Part C of this decision, the trial court credited James for expenditures he made on marital expenses during the separation period.

It was not an abuse of discretion for the court to characterize the Wasilla properties as James's separate property, and to recapture the funds James invested in them as a prior cash distribution.

### B. The Trial Court's Valuation of the Marital Estate Was Not Clearly Erroneous.

#### 1. It was not clear error to divide the Partridges' pensions by QDRO.

■■■ James contends that the trial court erred by failing to direct the parties to value their pensions. This argument is without merit because the court accounted for the parties' pensions by issuing a qualified domestic relations order (QDRO).[23] Moreover, James's closing argument suggested dividing the parties' pensions by QDRO and did not pursue the valuation issue.[24] The trial court stated in its findings: "[t]here was inadequate valuation evidence to determine a present value [of the pensions] and so the QDRO solution, as our Supreme Court said[,] seemed to me the only feasible way to approach that." The trial court accurately interpreted our precedent and did not commit clear error by using a QDRO to divide the pensions.[25]

#### 2. The trial court considered and properly valued the KCP reserve accounts.

■■■ James argues that the trial court erred by finding KCP reserve accounts totaling over $209,000 to be "inconsequential" and awarding them to Erlinda without crediting them to her in the court's property division spreadsheet. But James mischaracterizes the court's finding. The trial court found that the estimated balance in KCP's reserve accounts roughly equaled its liabilities. The court added $47,712 from the "environmental reserve account," $80,893 from the "cash in operations account," and $43,693 from the "cash in reserve account," then subtracted the $120,000 allowance for a roof repair and $47,712 from the "future environmental expense account." The net of these account balances totaled $4,586, which prompted the court to comment, "I do not see that there was sufficient evidence to warrant their inclusion [in the property division]." The court

---

**22.** *Foster*, 883 P.2d at 400.

**23.** James claims that *Mellard v. Mellard*, 168 P.3d 483, 486 (Alaska 2007), authorizes the court to direct the parties to "fill an 'evidentiary void' " in situations where a couple neglects to value their pensions. *Mellard* only suggests this solution in cases where the "trial court did not wish to resolve the matter by using a QDRO." *Id.* The trial court used a QDRO in this case so *Mellard* does not control.

**24.** James stated: "The marital portions of the pensions can be divided by QDRO or they can be left with the person presently receiving them."

**25.** James also mentioned the trial court's failure to order the parties to value their health insurance benefits in his points on appeal. Since James failed to brief this issue, it is waived. *Carpentino v. State*, 42 P.3d 1137, 1139 (Alaska App.2002) ("A party's failure to brief an issue constitutes abandonment of that issue") (quoting *Booth v. State*, 903 P.2d 1079, 1090 (Alaska App. 1995)).

noted that the property taxes were not addressed by the evidence introduced at trial and that the evidence regarding the cost of the roof repair was inconclusive. The trial court's decision to net KCP's approximate cash balance against its estimated outstanding liabilities was not clear error.[26]

## C. The Trial Court's Allocation of Marital Assets Was Not an Abuse of Discretion.

James argues on appeal that the trial court erroneously concluded that the parties could not jointly own KCP post-divorce and inadequately considered the possibility of dividing KCP between them. He also challenges the trial court's application of the *"Merrill* factors"[27] enumerated in AS 25.24.160. Specifically, he challenges the trial court's consideration of the circumstances and necessities of each party and the income-producing capacity of the property at the time of the division.[28] Finally, he alleges the trial court

failed to adequately consider the separate property he brought into the marriage.

The trial court has broad discretion to divide property in divorce cases.[29] We review the trial court's property division "purely under the abuse of discretion standard."[30] Alaska Statute 25.24.160(a)(4) requires trial courts to "fairly allocate the economic effect of divorce" and codifies several factors for courts to consider to achieve this goal.[31] We have held that these statutory factors are not exhaustive and that "the trial court need not make findings pertaining to each factor,"[32] but it must make sufficient findings to "indicate the factual basis for the conclusion reached."[33] We view the trial court's factual findings in the light most favorable to the prevailing party below,[34] and will not reverse a trial court's factual determinations accompanying equitable distribution except upon a finding of clear error.[35] We will not overturn a property division "unless it is clearly unjust."[36]

**26.** *See Ogden v. Ogden,* 39 P.3d 513, 520 (Alaska 2001) (holding that the valuation step of division of marital assets involves factual determinations reversed only where the trial court clearly erred in making them) (citing *Dodson v. Dodson,* 955 P.2d 902, 905 (Alaska 1998)).

**27.** *Merrill v. Merrill,* 368 P.2d 546, 547 n. 4 (Alaska 1962).

**28.** AS 25.24.160(a)(4)(G) and (I).

**29.** *Abood v. Abood,* 119 P.3d 980, 984 (Alaska 2005) (citing *Cox v. Cox,* 882 P.2d 909, 913 (Alaska 1994)).

**30.** *Walker v. Walker,* 151 P.3d 444, 447 (Alaska 2007) (quoting *Moffitt v. Moffitt,* 749 P.2d 343, 346 (Alaska 1988)).

**31.** AS 25.24.160(a)(4)(A)-(I), otherwise known as the *"Merrill* factors." *Merrill,* 368 P.2d at 547 n. 4. AS 25.24.160 states, in relevant part:

The division of property must fairly allocate the economic effect of divorce by being based on consideration of the following factors:
(A) the length of the marriage and station in life of the parties during the marriage;
(B) the age and health of the parties;
(C) the earning capacity of the parties, including their educational backgrounds, training, employment skills, work experiences, length of absence from the job market, and custodial responsibilities for children during the marriage;

(D) the financial condition of the parties, including the availability and cost of health insurance;
(E) the conduct of the parties, including whether there has been an unreasonable depletion of marital assets;
(F) the desirability of awarding the family home, or the right to live in it for a reasonable period of time, to the party who has primary physical custody of the children;
(G) the circumstances and necessities of each party;
(H) the time and manner of acquisition of the property in question; and
(I) the income-producing capacity of the property and the value of the property at the time of division.

**32.** *Nicholson v. Wolfe,* 974 P.2d 417, 422 (Alaska 1999) (citing *Brooks v. Brooks,* 677 P.2d 1230, 1233 (Alaska 1984)).

**33.** *Id.* (citing *Merrill,* 368 P.2d at 548 n. 10).

**34.** *Rausch v. Devine,* 80 P.3d 733, 737 (Alaska 2003) (citing *Klosterman v. Hickel Inv. Co.,* 821 P.2d 118, 121–22 (Alaska 1991)).

**35.** *McCoy v. McCoy,* 926 P.2d 460, 463 (Alaska 1996) (citing *McDaniel v. McDaniel,* 829 P.2d 303, 305 (Alaska 1992)).

**36.** *Wanberg v. Wanberg,* 664 P.2d 568, 574 n. 20 ("Given adequate factual findings, and a demonstration that the trial court weighed those facts in reaching its conclusion, we will not overturn a property division unless it is clearly unjust.").

### 1. The trial court's decision to award Yamhill solely to James was not an abuse of discretion.

■ James challenges the trial court's decision to award the Yamhill County investment property entirely to him. He argues that it would have been simple to divide Yamhill fifty/fifty and that the trial court failed to account for James's contingent liability to Nordgren. We find these arguments unpersuasive.

The trial court awarded Yamhill to James for two reasons. First, the court concluded that the parties could not successfully co-own the property due to James's "lack of candor" regarding his business dealings, including his dealings with Nordgren. Yamhill is undeveloped real estate and jointly developing it would necessarily entail considerable cooperation and communication between the parties. The court's concern with James's candor and conduct supports awarding Yamhill to one party or the other. Because the court found that James's relationship with Nordgren put him in "a far better position to be able to develop [Yamhill] and turn it into a[n] income producing property within a reasonable time frame" the court awarded it to James rather than Erlinda. The court considered James's history of success developing properties and commented, "I see Mr. Partridge as having a far better demonstrated ability to develop [Yamhill], [and] create it into an income producing property than Ms. Partridge."

■ James also contends that the trial court failed to account for the obligation owed to Nordgren for his help developing Yamhill. But this argument overlooks the parties' stipulation regarding Yamhill's value, and the trial court's adoption of their stipulation. Stipulations are generally "controlling in the absence of fraud, duress, concealment of assets or other facts showing that the agreement was not made voluntarily and with full understanding." [37] Because there is

no evidence of fraud, duress, or concealment, James waived his argument challenging the Yamhill valuation.

■ Finally, James argues that the economic downturn has pummeled Yamhill's value, its prospects for development, and that he is left "bearing all of the risk of a bad economy." The argument that this constitutes error ignores settled law. We do not doubt the serious impact a falling real estate market can have on a party who receives a large allocation of real property. But we have repeatedly held that "the date on which the trial court values marital property generally should be as close as practicable to the date of trial." [38] This case perfectly illustrates the importance of the rule. No one can divine the economy's next move, and we will not reverse the trial court for failing to anticipate market fluctuations that cause asset values to change after they have been reasonably pegged at trial.

### 2. The trial court did not abuse its discretion by awarding Erlinda the sole income-producing asset.

■ James argues that the trial court abused its discretion by awarding KCP to Erlinda because that allocation resulted in an unequal division of the parties' monthly income. In support of this argument he compares his monthly income and expenses to Erlinda's projected income: "[James's] monthly expenses, [$9,298] of which are directly related to the property he received, exceed his [monthly] income [of $5,934] by over $3,300. As reflected on the other side of the same ledger, Erlinda enjoys a monthly income of $20,619." Accepting James's claim that the economic effect of the property division has been "devastating" requires that we ignore the assets he received in the property division. The trial court awarded James the vast majority of the marital estate's liquid assets.[39] Nevertheless, James contends that the trial court failed to divide the marital assets in a manner that fairly apportions the

---

**37.** *Forshee v. Forshee,* 145 P.3d 492, 502 (Alaska 2006) (citing *Jordan v. Jordan,* 983 P.2d 1258, 1264 (Alaska 1999)).

**38.** *Id.*

**39.** The court's division provided James $228,357 in cash, a $62,572 retirement savings account, a $20,307 investment account, and an equalizing payment of $172,940—a total of $484,176 in liquid assets.

overall monthly income stream. He argues that the court ignored "the income-producing capacity of the property." [40]

The record convinces us that the trial court did consider the income-producing versus income-consuming nature of the assets it awarded.[41] The court was aware of the effect of allocating KCP to Erlinda and Yamhill to James:

> With regard to income producing capacity ... [KCP has] $3.6 [million] thereabouts of value, of equity. I look, however, at Yamhill, $1.4 [million] undeveloped, but I see Mr. Partridge as having a far better demonstrated ability to develop that, create it into an income producing property than Ms. Partridge.... I looked at that and I gave Mr. Partridge a lot of the cash, every bit I could except for $50,000 for what I assume would go toward any needs of Ms. Partridge, that's the other reason I put all the cash in his corner, is to balance that out.

The trial court arrived at this allocation largely because of James's own conduct: his "lack of disclosure, candor and forthrightness with regard to [ ] finances" during the separation period convinced the court that the parties could not successfully co-own assets such as Yamhill or KCP. The trial court did not believe the parties should even be neighbors: the "type of continued contact of being adjoining property owners requires an ability for each party to treat the other one fairly and openly. That has not been demonstrated here."

We are mindful that the four warehouses comprising KCP were previously held by two separate owners and that the only physical barrier to returning to the previous ownership configuration appears to be easily overcome: an easement could be provided to the owner of lot four to cross lot three. James makes a strong argument that it was an abuse of discretion for the trial court to decline to award one lot to each party in light of the income-producing capacity of KCP, the fact that both parties have retired and are no

longer earning income, and the absence of any other income-producing assets in the marital estate. This is admittedly a very close call, but we ultimately conclude that the trial court did not abuse its discretion. The reason for this again relates to the court's findings regarding James's conduct during the separation period.

Yamhill and KCP are the two largest assets in the Partridge estate. James essentially created a third indivisible subset of the marital estate by spending hundreds of thousands of dollars on the Wasilla properties during the separation period. The court credited James with a prior cash distribution of $776,836 for the reasons explained above. And the court awarded Yamhill to James because it found that the parties should not co-own a large undeveloped tract of real estate and because James's experience and relationship with Nordgren made him the better choice to receive that property. The value of James's pre-trial cash distribution, plus the value of Yamhill, totals $2,236,393. Given these awards, the court could not split KCP, maintain a fifty/fifty property division, and still order a reasonable equalizing payment. James's conduct forced the court's hand.

Finally, the trial court considered the value each party "bid" for KCP. Erlinda valued KCP at $676,000 more than James did and was willing to have it awarded to her at that value. The court's decision to adopt Erlinda's value for KCP benefitted James. Having considered all of these circumstances, we do not find that the trial court's property division was "clearly unjust." [42]

### 3. The trial court considered James's separate property contributions.

James contends that the trial court's property division fails to account for the separate property he contributed to the marriage. James makes two arguments. The first pertains to a farm he owned in Minnesota at the time the parties married. James argues that the court should have considered

---

**40.** AS 25.24.160(a)(4)(I).

**41.** The court adopted Erlinda's appraisal of KCP which itself was based on an income approach.

**42.** *McCoy v. McCoy,* 926 P.2d 460, 463 (Alaska 1996).

whether the substantial appreciation of the farm between 1987 and 1991 was active or passive. Because he believes it was passive, he argues that he should be credited with the appreciation as his separate property. Second, James faults the court for not considering $150,000 of pre-marital equity he had in condominiums.

James's arguments are not supported by the evidence or Alaska law. The trial court expressly considered James's Minnesota farm in its order. The evidence established that the farm was exchanged for an apartment building, and the parties later exchanged the equity in the apartment building for KCP. James conceded at trial that KCP was marital property. The court did not fail to account for James's pre-marital ownership interest in the Minnesota farm; the court recognized that this equity was contributed toward the purchase of an asset that was conceded to be marital. Nor did the court overlook James's pre-marital equity in the condominiums. Leaving aside the question of whether the condominium equity was transmuted into marital property over the course of the parties' marriage, the trial court acknowledged that James's separate property contributions were "noteworthy" but concluded that his pre-marital contributions of equity comprised a "relatively small component in the amassment of wealth that has occurred during the course of this 20–year marriage."

"We have held that contributions of separate property may be relevant to equitable division [but] we have not held that failure to make an adjustment for such contributions constitutes an abuse of discretion." [43] James "may disagree with the weight accorded to these contributions, but that alone does not support a conclusion that the trial court

failed to consider these contributions or otherwise abused its discretion." [44]

### 4. Failing to credit James for paying over $100,000 of marital debt was error.

▇▇▇ James argues that the trial court erred by failing to credit him for $101,808 in marital loans that he paid during the separation period.[45] We agree.

A bank statement for June 8 to July 7, 2006 shows that the Partridges owed $101,808 on three debts near the time of their separation: loans for a 2005 Roadtrek motorhome and a 1993 Monaco motorhome, and a line of credit. Each debt is presumptively marital because each was outstanding as of June 30, 2006, the court-declared date of separation. We have held that, "[a]bsent any showing that the parties intended a debt to be separate, the trial court must presume that a debt incurred during the marriage is marital and should consider it when dividing the marital estate." [46]

James made four payments of $2,705.25 on the motorhome loans in June, July, August, and September 2006. In October 2006 James paid off the loan balances for both motorhomes and the credit line. It does not appear that James received credit in the court's final accounting for paying these marital debts. The court adopted Erlinda's expert's accounting and credited James for paying just $23,454.55 of marital debt during the separation period. Erlinda's expert explicitly classified James's payments on the motorhome loans as his "separate property" without explanation and omitted his satisfaction of the balance on the line of credit entirely. Because the trial court did not credit James for retiring these marital loans, we remand the court's property division for consideration of this credit.[47]

---

**43.** *Fortson v. Fortson*, 131 P.3d 451, 459 (Alaska 2006).

**44.** *Id.*

**45.** James argues the court failed to account for marital loans of $101,898.88. But the sum of the debts he cited equals $101,808.88 (38,-902.11 + 14,209.34 + 48,697.43).

**46.** *Ginn–Williams v. Williams*, 143 P.3d 949, 956 (Alaska 2006) (quoting *Hansen v. Hansen*, 119 P.3d 1005, 1009 (Alaska 2005)).

**47.** We note that while the trial court must consider the payments James made to maintain the marital property, it is for the trial court to decide whether he should receive a dollar-for-dollar credit in the final property division. *Ramsey v. Ramsey*, 834 P.2d 807, 809 (Alaska 1992).

5. **It was error to credit the parties with the marital portion of pensions received between their separation and divorce without determining whether they spent their pensions on normal living expenses.**

■ James argues that the trial court erred by charging each party with the marital portion of the pension payments received during the separation period. During that period, James received $49,694 and Erlinda received $27,192 from marital pensions. The trial court treated these amounts as pretrial cash distributions made to each party for property division purposes.

■ Assets that no longer exist at the time of trial are normally not available for distribution.[48] Marital assets that are spent after separation for marital purposes or normal living expenses are not typically taken into account in the final property division.[49] Here, no evidence was presented that the pension payments the parties received during the two-year separation period still existed at the time of trial. Erlinda testified that her pension was one of her only sources of income during that time. James did not testify to how he used the marital portion of his pension or whether the funds still existed, but he argues on appeal that it was "perfectly obvious that both parties were using the[ ] [pensions] to fund ordinary living expenses."

We remand for the trial court to make findings on whether the pension funds still existed at the time of trial, whether they were spent on normal living or marital expenses, or whether they were disposed of differently before charging each party with the full value of the income received from pensions during the separation period.

## VI. CONCLUSION

We REVERSE and REMAND for consideration of the credit due to James for paying marital debt and for findings on the disposition of the pension payments received during the separation period. We AFFIRM the trial court's judgment in all other respects.

EASTAUGH, Justice, not participating.

---

48. *Brandal v. Shangin,* 36 P.3d 1188, 1194 (Alaska 2001) (citing *Cox v. Cox,* 882 P.2d 909, 918 n. 5 (Alaska 1994)).

49. *Jones v. Jones,* 942 P.2d 1133, 1139 (Alaska 1997).